*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0076P (6th Cir.)
File Name: 01a0076p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICHAEL HAMILTON,
Independent Fiduciary, SCIW
Health & Welfare Trust Fund;
SOUTHERN COUNCIL OF
INDUSTRIAL WORKERS
HEALTH & WELFARE TRUST
FUND,
     *Plaintiffs-Appellants,*

     *v.*

JAMES W. CARELL; ACHIEVER
CORPORATION; J.W. CARELL
ADMINISTRATORS, INC., &
J.W. CARELL
ADMINISTRATORS &
CONSULTANTS, INC.;
DIVERSIFIED HEALTH
MANAGEMENT, INC.,
     *Defendants-Appellees.*

No. 99-6171

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 96-00802—Thomas A. Higgins, District Judge.

Argued:  January 31, 2001

Decided and Filed:  March 22, 2001

Before:  MARTIN, Chief Judge; COLE, *Circuit Judge;
NUGENT, District Judge.

_____

**COUNSEL**

**ARGUED:**    David M. Cook, Cincinnati, Ohio, for
Appellants.    James G. Thomas, NEAL & HARWELL,
Nashville, Tennessee, for Appellees.  **ON BRIEF:** David M.
Cook, Cincinnati, Ohio, for Appellants.  James G. Thomas,
NEAL & HARWELL, Nashville, Tennessee, for Appellees.

_____

**OPINION**

_____

R. GUY COLE, JR., Circuit Judge.  Plaintiffs-Appellants
Michael Hamilton and the Southern Council of Industrial
Workers Health and Welfare Trust Fund appeal the district
court's judgment entered following a bench trial in favor of
Defendants-Appellees James W. Carell and various
corporations owned, operated, and controlled by Carell,
including Diversified Health Management, Inc. ("DHM").
This action stems from the purchase and handling of certain
investments by P. Steven Beard, who was employed as
Comptroller of DHM but who also performed investment
services for the trust fund.  Plaintiffs originally filed suit
against numerous defendants, most of whom have been
dismissed, claiming joint and several liability for breaches of
fiduciary duties arising under Title I of the Employee
Retirement Income Security Act ("ERISA"), 29 U.S.C.

_____

* The Honorable Donald C. Nugent, United States District Judge for
the Northern District of Ohio, sitting by designation.

Although Carell's various corporations certainly had an
identity of interests, Plaintiffs failed to establish that NAA
was a "shell" in that the corporate form was used for
fraudulent or improper purposes so as to avoid a legal
obligation.  Thus, we hold that the district court did not err in
refusing to collapse the corporate form simply so that
Plaintiffs could recover beyond the settlement amount
recovered from NAA.

**CONCLUSION**

Accordingly, we **AFFIRM** the judgment of the district
court.

state law. Courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined.

*Lowen*, 829 F.2d at 1220-21 (other citations omitted). In both *Lowen* and *Valley Finance*, the courts were keenly interested in the fact that the liable corporate entities were under-capitalized, as are most corporate entities that are set up simply to shield the principals from liability. *See Lowen*, 829 F.2d at 1221; *Valley Fin.*, 629 F.2d at 171-72. It is this act of setting up corporate entities as "shells" so as to shield principals from liability that is referred to as a "shell game"–it creates an unjust result by leaving the plaintiffs unable to recover from the liable corporate entities.

Here, NAA was solvent when it settled with Plaintiffs, and such solvency cuts against Plaintiffs' argument that Carell played the "shell game" and set up different corporations so as to avoid liability. Because NAA was solvent, there was no need to disregard the corporate form so as to allow Plaintiffs to obtain satisfaction: Plaintiffs recovered $600,000 from NAA and presented no evidence that NAA could not have funded a judgment for the full amount of Plaintiffs' demands.

Defendants direct the Court to *Green v. William Mason & Co.*, 996 F. Supp. 394 (D.N.J. 1998), a decision arising in the context of a corporate defendant's motion to dismiss in an ERISA action for breach of fiduciary duties based on inappropriate investments in "speculative derivative securities." *Id.* at 395. The district court dismissed the complaint against the corporate defendant, observing the "general rule" that "absent fraud or bad faith, a corporation will not be held liable for the acts of its wholly owned subsidiaries or other affiliates." *Id.* at 398. The district court further noted that even in light of ERISA's policy goal, which may warrant the relaxation of deference afforded to the corporate form, "a finding of some fraudulent intent is the *sine qua non* to veil-piercing." *Id.* (quoting *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 21 (1st Cir. 1998)) (alteration omitted).

§ 1001 (1994) *et seq.* On appeal, Plaintiffs assign error to the district court's judgment as follows: (1) the district court clearly erred in finding that Carell was not a fiduciary to the trust during the applicable time period; (2) the district court erred in failing to hold DHM liable for Beard's actions under the doctrine of respondeat superior; and (3) even if respondeat superior liability cannot attach to DHM, the district court erred in declining to ignore the corporate form so as to find the "Carell corporations" liable as a single entity under the doctrine of respondeat superior. For the reasons that follow, we **AFFIRM** the judgment of the district court.

## BACKGROUND

Plaintiff Southern Council of Industrial Workers Health and Welfare Trust Fund is a joint union-employer Taft-Hartley trust fund within the meaning of ERISA, 29 U.S.C. § 1002. Plaintiff Michael Hamilton is an independent fiduciary of the trust fund and was engaged to investigate the investment of trust fund assets in derivative collateralized mortgage obligations ("CMOs") between August 30, 1993, and April 28, 1994. The trust fund's "Statement of Investment Principles" provides that investments are to be made in secure instruments only and that "investments of a speculative nature are not to be made regardless of possible return." It is undisputed that the CMOs at issue here were not suitable investments for the trust fund.

Although the trust fund has had a number of third-party administrators, up until September 30, 1994, each has been a corporation related, at some point in time, to Defendant James A. Carell. Carell owned, operated, and controlled Defendants Achiever Corporation ("Achiever"), J. W. Carell Administrators & Consultants, Inc. ("JWCA&C"), and DHM. Carell also owned and operated North America Administrators ("NAA"), an original defendant with whom Plaintiffs settled, and J. W. Carell Administrators, Inc.

("JWCA"), a company never named in Plaintiff's complaint.[1] Until January 1, 1992, JWCA&C was the third-party administrator for the trust fund; thereafter, JWCA took over as the third-party administrator and remained so until it merged with NAA, effective October 1, 1993. Thereafter, NAA became the third-party administrator of the trust fund and remained so for the duration of the investment period in question. Thus, because we are looking at the investment period between August 30, 1993, and April 28, 1994, the trust fund's third-party administrators during that period were JWCA (from August 30, 1993, to October 1, 1993) and its successor in interest, NAA (from October 1, 1993, to April 28, 1994).[2]

On May 30, 1993, Carell suffered a devastating, life-threatening injury in a watercraft accident. It is undisputed that up until May 30, 1993, Carell had provided investment advice to trustees of the trust fund; he and employees under his direction and control managed the investment and assets of the trust fund on a day-to-day basis. One of those employees was Beard, who in the late 1980s, assumed certain investment responsibilities for JWCA&C, the third-party administrator of the trust fund at the time. Beard actually was employed as Comptroller of DHM, a Carell company in the business of managing home healthcare agencies, and remained so during all relevant times giving rise to this suit. DHM never was involved in making investments for the trust fund. As found by the district court, "Mr. Beard assumed investment responsibilities for the JWCA&C on behalf of the

---

[1] Plaintiffs name JWCA in their notice of appeal, which is why the name appears in the caption, despite the fact that JWCA was never a party to this suit.

[2] The parties treat JWCA/NAA as a single entity for purposes of this litigation, and therefore, we will refer to the third-party administrator during the time in question as NAA, even though JWCA was the third party administrator for a few months before merging with NAA. It bears repeating that JWCA was never a party to this action, and NAA settled with Plaintiffs for a sum of approximately $600,000.

We have looked to the following factors in determining whether to set aside a distinct corporate form:

> (a) the corporation and shareholders have complete identity of interests; (b) the corporation is a mere instrumentality of the shareholders; (c) the corporation is a device to avoid a legal obligation; or (d) the corporation is used to defeat public convenience, justify a wrong, protect fraud or defend a crime.

*Wilcox v. United States*, 1992 WL 393581, *2 (6th Cir. Dec. 31, 1992) (unpublished) (quoting *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 112 (6th Cir. 1989)). Under ERISA, courts have recognized the permissibility of ignoring the corporate form when failure to do so would undermine the purposes of the statute. *See Reich v. Lancaster*, 55 F.3d 1034, 1046-47 (5th Cir. 1995); *Lowen v. Tower Asset Mgmt.*, 829 F.2d 1209, 1219-20 (2d Cir. 1987); *Valley Fin., Inc. v. United States*, 629 F.2d 162, 171 (D.C. Cir. 1982); *Daniels v. National Employer Benefit Svcs., Inc.*, 858 F. Supp. 684, 692 (N.D. Ohio 1994). In *Lowen*, the Second Circuit stated:

> Neither the separate corporate status of the three corporations nor the general principle of limited shareholder liability afford protection where exacting obeisance to the corporate form is inconsistent with ERISA's remedial purposes. Parties may not use shell-game-like maneuvers to shift fiduciary obligations to one legal entity while channeling profits from self-dealing to a separate legal entity under their control. The Supreme Court has "consistently refused to give effect to the corporate form where it is interposed to defeat legislative policies." *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 630 (1983). In determining whether to disregard the corporate form, we must consider the importance of the use of that form in the federal statutory scheme, an inquiry that generally gives less deference to the corporate form than does the strict alter ego doctrine of

corporation, third-party administrator NAA, while continuing to be employed by another, DHM. Because Beard was not acting within the course and scope of his employment with DHM when he purchased the CMOs at issue, DHM cannot be held liable for Beard's actions, and we need not reach the broader question of whether the doctrine of respondeat superior applies in ERISA cases. Accordingly, we AFFIRM the judgment of the district court on this ground.

## III.  DISTINCT CORPORATE FORM

Finally, Plaintiffs argue that even if respondeat superior liability cannot attach to DHM, the district court erred in declining to ignore the corporate form so as to find the "Carell corporations" liable for Beard's actions as a single entity. Plaintiffs argue that because Carell and his corporations administered and performed various duties for the trust fund up until September 30, 1994, to recognize a distinction among these corporations so as to avoid liability would circumvent ERISA's core purposes and evade public policy. *See* 29 U.S.C. § 1001(b) ("It is hereby declared to be the policy of this chapter to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."). Plaintiffs claim:

> Carell operated these corporations as a single entity: all operated out of a single location, utilizing the same offices, equipment and employees (who interchanged based on function), Carell owned and controlled each [corporation] 100%, paid all employees through a single payroll account, and covered all employees under a single 401k plan.

Defendants do not dispute these facts. Such characteristics, however, describe a multitude of closely-held corporations; these facts alone are not enough to warrant ignoring the corporate form under any circuit's law.

fund." The district court also recognized, "Individuals employed by a Carell corporation commonly provided services to other Carell corporations as well." Plaintiffs conceded this point in their motion for summary judgment, stating, "Carell employees commonly worked for several different Carell companies depending on what services were being provided." When asked by Plaintiffs' counsel whether he ever performed any work for JWCA, Beard testified that he "handled investments for the trust fund."

With regard to Carell's accident, Defendants point out that although the district court mentioned its occurrence, the district court failed to emphasize the magnitude of Carell's injuries, and such detail is necessary for purposes of understanding why Carell never resumed or attempted to resume his former role of managing trust fund assets after May 30, 1993. In short, Carell was at death's door for many months following his accident; he was in chronic pain and on extensive pain medication until October 1996, when he underwent surgery that allowed him to stop taking his pain medicine. For the three-and-a-half years following his accident, he was in a haze of drugs and does not remember "much of anything that happened."

Many of the key events at issue in this suit took place at the next regularly-scheduled trustee meeting following Carell's accident; this meeting took place on June 14, 1993.[3] Patsy Grooms, claims manager for JWCA, attended the trustee meeting in Carell's absence. Also at the meeting were trustees Ray White and Clovis Young, each of whom testified that at the time of the meeting, there was much uncertainty as to whether Carell would live or die. Grooms testified that the trustees asked her if she would handle the investments for the

---

[3]The events of this meeting are key in that they establish that the trust fund formed its own investment committee, thus taking back any discretion and control that Carell once had in acting as a fiduciary for the trust fund. As will be discussed *infra*, following the June 14 meeting, Carell no longer fit the definition of an ERISA fiduciary such that he could be found individually liable for any breach of fiduciary duty.

trust fund and that she said no, as she had no investment experience. She testified:

> The trustees were very concerned about [trust fund investments] because it was an area where apparently Mr. Carell had had a very hands-on, day-to-day oversight of the investment on their behalf, and they expressed that concern. They indicated in the meeting, and I believe it's reflected in the minutes that they were going to form an investment committee that would consist of Mr. White and Mr. Young, and that they were going to–they advised me that they were going to be coming to our office, that they were going to review all of the investments in detail with Mr. Beard, and that they were going to assume responsibility for oversight of the investment for the Southern Council.
>
> . . .
>
> The trustees had accepted or had advised that they were going to be responsible for the investment from June forward . . . .

Grooms testified that she was certain that the investment committee would not limit its discretion to the investment of certain securities but would oversee all trust fund investments. Grooms also testified that it had been established at the meeting that either White or Young would contact Beard following the meeting to inform Beard of the committee's investment decisions. In August, Grooms learned from Beard that neither trustee had contacted him; she suggested that Beard contact the trustees and arrange for a meeting, which he did. Beard testified that he did in fact contact trustee Young in August 1993 at Grooms's behest and that Young told him to continue handling the investments as he always had. Thereafter, between August 30, 1993, and April 28, 1994, Beard purchased fourteen high-risk CMOs, later determined to have been inappropriate investments for the trust fund and to have caused the trust fund to sustain a substantial loss. This fact is not in dispute.

*Federation* Court cited *Fink v. National Savings & Trust Co.*, 772 F.2d 951, 958 (D.C. Cir. 1985), and *Brock v. Gerace*, 635 F. Supp. 563, 569 (D.N.J. 1986). However, *Fink* did not address respondeat superior liability between a principal and agent; rather, *Fink* addressed the liability of co-fiduciaries, holding that liability for one fiduciary's breach of fiduciary duties can be imputed to a co-fiduciary who knowingly participates in, or knowingly conceals, the acts and omissions of the breaching fiduciary. *See Fink*, 772 F.2d at 958. In *Brock*, the court addressed the question of whether non-fiduciaries can be held liable under ERISA for knowingly participating in a breach of trust by a fiduciary that results in the non-fiduciaries' unjust enrichment. *See Brock*, 635 F. Supp. at 565. *Brock* involved the concept of unjust enrichment and had nothing whatsoever to do with the principal/agent relationship and the doctrine of respondeat superior.

Consequently, we disagree with the Fifth Circuit's interpretation of respondeat superior as requiring active and knowing participation on the part of the principal. Instead, we agree with the Seventh Circuit that the common-law doctrine of respondeat superior does not require a principal's active and knowing participation in the breach of fiduciary duties. In any event, there is no question that in order for respondeat superior liability to attach in an ERISA context, the agent must have breached his or her fiduciary duties while acting in the course and scope of employment. *See National Football Scouting, Inc. v. Continental Assurance Co.*, 931 F.2d 646, 648 (10th Cir. 1991); *American Fed'n*, 841 F.2d at 665; *Stuart Park Assoc. Ltd. P'ship v. Ameritech Pension Trust*, 846 F. Supp. 701, 708 (N.D. Ill. 1994); *Kral*, 800 F. Supp. at 1428.

Here, DHM cannot be held liable under the doctrine of respondeat superior because Beard's function of providing investment services to the trust fund was not in the course and scope of his employment as Comptroller of DHM. The district court expressly found this to be the case, determining that Beard assumed investment responsibilities for one Carell

In *American Federation*, the Fifth Circuit, applying the doctrine of respondeat superior, used a somewhat different approach, stating:

> The doctrine of respondeat superior can be a source of liability in ERISA cases. . . . For respondeat superior liability to attach, the employee must have breached his duty to a third party while acting in the course and scope of his employment. It is clear that Holden did not breach his fiduciary duties while acting in the scope of his employment as an Equitable agent. . . . He breached his fiduciary duties to the Fund while he was granting and denying benefit claims and carrying on activities as Fund administrator. These actions were clearly beyond the scope of his duties as an Equitable agent. Nor is the fact that some Equitable employees knew that Holden was acting both as an agent and as an administrator sufficient to justify the imposition of respondeat superior liability. *Equitable never actively and knowingly participated in Holden's breach of duty to the Fund, as is required for a finding of respondeat superior liability.* . . . Finally, respondeat superior liability cannot attach for Equitable's failure to properly train and supervise Holden. Liability for the failure to adequately train and supervise an ERISA fiduciary arises where the person exercising supervisory authority was in a position to appoint or remove plan administrators and monitor their activities.

841 F.2d at 665 (emphasis added); *see also Kral, Inc. v. Southwestern Life Ins. Co.*, 800 F. Supp. 1426, 1429 (N.D. Tex. 1992) (citing *American Federation* and holding that under a theory of respondeat superior, "[a]bsent active and knowing participation in the breach of fiduciary duties, a non-fiduciary cannot be held liable for the conduct of its agent"). As is clear from the above passage in *American Federation*, the court used the term "respondeat superior"–a doctrine which requires no fault on the part of the principal–when it seemed to be referring to direct liability. In holding that respondeat superior liability requires active, knowing participation on the part of the principal, the *American*

The minutes of the June 14 meeting corroborate Grooms's testimony:

> Mr. White suggested that an investment committee be established and with no objection from the Trustees, he appointed Mr. Young to the committee along with himself. Mr. White and Mr. Young will meet or have a conference with Steve Beard of the Administrator's office to discuss a procedure for handling investments.

Trustees White and Young testified, however, that although they did in fact form an investment committee to manage and monitor trust fund investments, the investment committee was limited to the management of a single investment–the Kemper High-Yield Fund–which had nothing to do with the CMOs at issue here. Plaintiffs staunchly maintain this position so as to support their contention that there was no trustee-comprised investment committee formed to oversee the CMO investments; that Carell never relinquished authority and control over the purchase and handling of the CMOs; and that Carell never relinquished authority and control over the actions of Beard.

The district court did not find the testimony of trustees White and Young credible. As noted by Defendants, resolution of much of this case turns on the district court's findings of fact and credibility determinations. As to whether the investment committee was formed for the limited purpose of monitoring only the Kemper High-Yield Fund, the district court expressly discredited the testimony of trustees White and Young:

> The Court simply does not find that testimony of Messrs. White and Young to be credible insofar as they claim that they formed the investment committee with a limited purpose, i.e., only to monitor the interest rates as they related to the Kemper High Yield Fund.

The district court also determined that it was Beard, not Carell, who determined which CMOs to purchase during the relevant time period. The district court further found that

Beard made these investments at the direction of Trustee Young, who told him to continue "doing what [he] had been doing" with regard to trust fund investments.

We are faced with three issues on appeal: (1) whether the district court was clearly erroneous in finding that Carell was not an individual fiduciary to the trust fund between August 30, 1993, and April 28, 1994, and thus breached no fiduciary duty; (2) whether the district court erred in failing to hold DHM liable for the actions of Beard under the doctrine of respondeat superior; and (3) whether the district court erred in declining to ignore the corporate form so as to find the "Carell corporations" liable as a single entity under the doctrine of respondeat superior. We will address each issue in turn.

## I. ERISA

### A. STANDARD OF REVIEW

This Court has not addressed the narrow issue of whether ERISA fiduciary status is strictly a factual issue subject to a clearly erroneous standard of review, a legal issue subject to de novo review, or a mixed question of law and fact, also subject to de novo review. Other circuits that have addressed the question have held that fiduciary status under ERISA is a mixed question of law and fact. *See Lopresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997); *Kramer v. Smith Barney*, 80 F.3d 1080, 1083 n.2 (5th Cir. 1996) ("The existence of a fiduciary relationship under ERISA, on the merits, is a mixed question of law and fact.") (citing *Reich v. Lancaster*, 55 F.3d 1034, 1044-45 (5th Cir. 1995)) (other citation omitted). Where the facts are not in question, a party's status as an ERISA fiduciary is purely a question of law. *See Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut.*, 982 F.2d 1031, 1034 (6th Cir.1993) (holding that whether an administrator of a self-insured benefits plan is an ERISA fiduciary is a conclusion of law subject to de novo review) (citation omitted); *Waxman v. Luna*, 881 F.2d 237, 240 (6th Cir. 1989) (holding that findings of fact that result from application of legal principles to subsidiary factual

direct liability. Under the doctrine of respondeat superior, an employer is liable, despite having no fault whatsoever, for the acts of its employees taken within the scope of their employment. *See Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998) ("[A] principal may be vicariously liable for an agent's torts under a respondeat superior theory. Under a respondeat superior rule, a principal is only held vicariously liable for torts committed by an agent when the agent acts for the benefit of his principal within the scope of his employment."); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 69 (5th ed. 1988). As Judge Merritt explained in *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48 (6th Cir. 1996), which addressed the doctrine of respondeat superior in a Title VII context:

> Although we erroneously referred to [employer liability in co-worker harassment cases] as "respondeat superior," we later realized that the term "respondeat superior" –which connotes derivative liability–is an incorrect label for co-worker harassment cases, where the employer is directly liable for its own negligence. This understanding, that the employer is directly not derivatively liable, and the underlying "knew or should have known" standard, are consistent with the law in other circuits. The standard is also consistent with the common law understanding of an employer's liability for the misconduct of employees.

*Id.* at 50 (citations and some internal quotation marks omitted). As Judge Posner wrote for the Seventh Circuit, "The liability of an employer for torts committed by its employees–without any fault on his part–when they are acting within the scope of their employment, the liability that the law calls 'respondeat superior,' is a form of strict liability. It neither requires the plaintiff to prove fault on the part of the employer nor allows the employer to exonerate himself by proving his freedom from fault." *Konradi v. United States*, 919 F.2d 1207, 1210 (7th Cir. 1990).

## II. RESPONDEAT SUPERIOR

Plaintiffs' second assignment of error alleges that the district court erred in failing to hold DHM liable for the actions of Beard under the doctrine of respondeat superior. Although ERISA specifically provides that a fiduciary may be liable for another fiduciary's breaches, *see* 29 U.S.C. § 1105(a), the district court found that DHM played no role in the investment of trust fund assets during the relevant time period and was not a fiduciary with regard to the CMOs at issue. Plaintiffs do not dispute this finding. Indeed, Plaintiffs do not allege that DHM is directly liable as a corporate fiduciary that breached its duties. Rather, they allege that DHM is derivatively liable under the doctrine of respondeat superior simply by virtue of its agency relationship with Beard. Plaintiffs correctly point out that the district court's analysis was misplaced insofar as it focused on DHM's direct liability, wholly missing the distinction between direct and derivative liability. As such, the district court provided no findings or analysis with regard to Plaintiffs' claim of respondeat superior liability.

Thus, the question we are faced with here is whether DHM, a non-fiduciary, can be held liable for Beard's breaches based on the agency relationship between Beard and DHM. This question is not easily answered. This Court has not determined whether the doctrine of respondeat superior may be applied in cases alleging a breach of fiduciary duty arising under ERISA. And even if we were to recognize the doctrine in this context, which we decline to do today, in order for respondeat superior liability to attach, we must find that Beard was in fact a fiduciary who breached his fiduciary duties while acting in the course and scope of his employment with DHM.

Although some courts have recognized that respondeat superior liability may apply in cases arising under ERISA alleging breach of fiduciary duties, this area of the law has been muddled by the fact that many of those courts consistently have confused respondeat superior liability with

---

determinations are subject to de novo review); *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1458 (9th Cir. 1995). However, where a party challenges the district court's findings of fact underlying its legal conclusion as to a person's fiduciary status under ERISA, as Plaintiffs do here, those findings remain subject to a clearly erroneous standard of review as mandated by Fed. R. Civ. P. 52(a).[4] *See LoPresti*, 126 F.3d at 39 (distinguishing between a trial court's findings of fact, which are reviewed for clear error, and its legal conclusions drawn from those facts, which are reviewed de novo); *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 913 (9th Cir. 1997) ("[The] conclusion that someone is not an ERISA fiduciary is essentially a factual conclusion."); *Kramer*, 55 F.3d 1044 ("[W]hile the legal conclusions to be drawn from the facts are assessed de novo, the historical facts that underlie the determination whether someone is an investment advisor under ERISA are reviewed for clear error.").

A district court's findings of fact will be deemed clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1067 (6th Cir. 1994) (citing *Anderson v. Bessemer Corp.*, 470 U.S. 564, 573 (1985)). Accordingly, our review of the district court's factual determinations is limited; so long as the district court's view of the evidence is "plausible in light of the entire record, it must stand, even though the reviewing court, had it been the finder of fact, might have judged the same evidence differently." *Glover v. Johnson*, 199 F.3d 310, 312 (6th Cir. 1999) (citing *Anderson*, 470 U.S. at 573). Furthermore, to the extent that a district court's findings of fact rest on credibility determinations, "Rule 52 requires even greater deference." *Bartling*, 29 F.3d at 1067. As the Supreme Court has held:

---

[4]Rule 52 states, "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." FED. R. CIV. P. 52(a).

When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. . . . [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson*, 470 U.S. at 575 (internal citations omitted).

## B. FIDUCIARY STATUS

Under ERISA, a fiduciary is defined as follows:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). ERISA also defines a "person" to include a corporation. *See* 29 U.S.C. § 1002(9). The Supreme Court has recognized that ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan . . . ." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). The Sixth Circuit recently emphasized the need to examine the conduct at issue when determining whether an individual is an ERISA fiduciary:

action following Carell's departure. Thus, the district court was entitled to draw the inference that Carell was not acting as an ERISA fiduciary during the relevant time period.

## 2. Carell did not receive a fee for rendering investment advice within the meaning of ERISA's § 1002(21)(A).

The district court determined that Carell did not receive a fee for rendering investment advice within the meaning of the statute because the only compensation Carell received was paid pursuant to the January 1, 1992, fund administration agreement, which simply stated various functions of the administrator (JWCA at the time), none of which involved investment-related services. The district court stated:

Although the compensation of JWCA was derived in part from the fund's investment portfolio in that JWCA's fee was based on a sliding percentage of the fund's monthly growth income, the plaintiffs have presented no evidence that such a fee structure was out of the ordinary for a general fund administration agreement in which no investment services are provided.

Plaintiffs failed to establish that after Carell's accident, he received fees specifically attributable to investment-related services. Plaintiffs do not seriously contest this finding except to argue that Carell did render investment advice to the trustees, a point we reject.

In sum, we are not left with the "definite and firm conviction that a mistake has been committed" by the district court with regard to its determination that from August 30, 1993, to April 28, 1994, Carell did not exercise discretionary authority or control over the management or administration of the trust fund or disposition of its assets with regard to the fourteen CMOs at issue. *Bartling*, 29 F.3d at 1067. Thus, we hold that the district court was not clearly erroneous in finding that Carell was not an individual fiduciary to the trust fund during the applicable time period within the meaning of § 1002 (21)(A). Accordingly, we AFFIRM the judgment of the district court on this ground.

Administrator" and that he knew nothing at all about the second memorandum. Grooms testified that she had no recollection of the first memorandum and had no idea who prepared the second one. In light of the fact that Carell performed only ministerial functions at the above-mentioned trustee meetings, brought Legg Mason representatives to the September meeting so as to encourage the trustees to obtain an investment advisor, and was not invited to the January 1994 trustee meeting, the inadvertent reference to Carell as "Contract Administrator" is not enough to support a finding that Carell continued to administer the fund in a fiduciary capacity.

Finally, as additional evidence that the trustees did not consider Carell to have had discretionary authority and control over the management and disposition of trust fund assets during the relevant time period, the district court relied on the fact that the trustees did not enter into a contract for independent investment services until June 1995. As the district court noted, Carell did not meet with the trustees or attend any other trustee meetings following the April 1994 meeting. Furthermore, Plaintiffs' contract with NAA was terminated as of September 30, 1994, when Accordia, a company unrelated to Carell, became the third-party administrator. But it was not until eight months later that the trust fund entered into a contract for investment services with Seix Investment Advisors, Inc.[5] The district court found these facts significant in that they supported its determination that "the trustees took control of the investments after Mr. Carell's accident and retained that control until they decided, long after Mr. Carell's departure, to obtain the investment services of Seix Investments." Had the trustees obtained other investment services immediately following Carell's departure, it would support Plaintiffs' position that the trustees thought, up until that point, Carell was providing such services. However, the trustees took no immediate

---

[5]It was Seix Investments that advised liquidation of the fourteen CMOs.

---

The fiduciary obligations imposed by ERISA are implicated only where an employer acts in its fiduciary capacity. Thus, we must examine the conduct at issue to determine whether it constitutes "management" or "administration" of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards.

*Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000) (internal quotation marks, alterations, and citations omitted) (citing *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 666 (6th Cir. 1998) ("[T]he fact that an action taken by an employer to implement a business decision may ultimately affect the security of employees' welfare benefits does not automatically render the action subject to ERISA's fiduciary duties."); *Akers v. Palmer*, 71 F.3d 226, 231 (6th Cir. 1995) ("ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants . . . . [O]nly discretionary acts of plan management or administration, or those acts designed to carry out the very purposes of the plan, are subject to ERISA's fiduciary duties.")). Recognizing that a person deemed to be a fiduciary is not a fiduciary for every purpose but only to the extent that he performs one of the described functions, *see Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994), the Seventh Circuit has described "discretion" as the *sine qua non* of fiduciary status, *see Pohl v. Nat'l Benefits Consultants*, 956 F.2d 126, 129 (7th Cir. 1992).

### 1. Carell did not exercise discretionary authority or control within the meaning of ERISA's § 1002(21)(A).

The district court found that Carell was not in fact an ERISA fiduciary with regard to the CMOs purchased between August 30, 1993, and April 28, 1994, because he did not exercise discretionary authority over the management or administration of the fourteen CMOs at issue, nor did he render investment advice for a fee. The district court's

findings were based in part on the fact that Plaintiffs presented no evidence showing that Carell caused the trustees to relinquish their independent discretion after forming the investment committee and, instead, to follow a course prescribed by him. The district court drew this legal conclusion from a number of witness credibility determinations and other factual findings; Plaintiffs, in turn, argue that this finding was clearly erroneous and unsupported by the record.

The district court expressly found that at the June 14 trustee meeting, the trustees formed their own investment committee to exercise discretion over all trust fund investments. The testimony of trustees White and Young, *i.e.*, that the investment committee was limited to control of the Kemper High-Yield Fund only, was "a bit too well-rehearsed" to be credible. Instead, the district court credited the testimony of Grooms and Beard, who claimed that the investment committee would oversee all trust fund investments. To further bolster this finding, the district court relied on the fact that the minutes from the meeting, which were reviewed and unanimously approved at the following meeting, did not refer to the Kemper High-Yield Fund.

Plaintiffs argue that Carell stepped back into his role of managing and overseeing trust fund investments upon his return to work in September 1993. In support of this argument, Plaintiffs point to the fact that Carell attended some of the monthly trustee meetings, specifically, the meetings held in September 1993, November 1993, and April 1994. Like the district court, we are not convinced that Carell's attendance at these meetings was sufficient to demonstrate that he exercised discretionary authority or control over trust fund investments.

At the September 1993 meeting, Carell simply read some financial reports to the trustees–much like Grooms did at the June 14 meeting, and she had no investment expertise. Carell's performance was purely a perfunctory, ministerial function. Moreover, the trustees informed Carell that his

services as contract administrator would be terminated in six months, and Carell urged the trustees to obtain an investment advisor. In fact, Carell brought with him representatives from the investment firm of Legg Mason to make a presentation. Grooms testified that the purpose of the presentation was to encourage the trustees to obtain an investment advisor because the trustees now were responsible for their own investment decisions. The minutes reflect that Legg Mason suggested that one of its firm managers attend either the October or November trustee meeting, free of charge, to prepare a written investment policy for the trust fund. Carell discussed this suggestion with the trustees, but they did not avail themselves of such services. At the November 1993 and April 1994 trustee meetings, Carell simply reviewed investments and discussed the portfolio performance. As noted by the district court, the minutes from the April 1994 meeting reflect that Carell asked the trustees for investment suggestions, "signifying that both Mr. Carell and the trustees understood that the trustees, and not Mr. Carell, were responsible for deciding the investments of the fund. The minutes reflect absolutely no input from Mr. Carell about where or in what to invest the monies of the fund."

Plaintiffs also rely on two memoranda from Carell to the trustees to support their assertion that Carell was a fiduciary during the time in question. On June 1, 1994, Carell instructed Grooms to send a memorandum to the trustees, under his name, explaining a change in valuation of the Kemper Fund. Although the contract administrator at this point was NAA, the memorandum stated that it was from "James A. Carell, Contract Administrator." Two days later, another memorandum was sent to the trustees entitled, "Revision To The Minutes From The April 28, 1994 Meeting." Again, this memorandum stated that it was sent from "James A. Carell, Contract Administrator." Plaintiffs point to these two items as further evidence that up until that point, Carell continued to exercise discretionary authority and responsibility over administration of the trust fund. We are unpersuaded. Carell testified that he did not know why the first memorandum referred to him as "Contract