**Stephen V. McGRATH, Plaintiff–Appellee/Cross–Appellant,**

v.

**LOCKHEED MARTIN CORPORATION, Lockheed Martin Energy Systems, Inc., Restated Retirement Program for Employees of Martin Marietta Energy Systems, Inc., and the Committee for the Restated Re-**

tirement Program for Employees of Martin Marietta Energy Systems, Inc., Defendants–Appellants/Cross–Appellees,

Nos. 00–6601, 00–6602.

United States Court of Appeals, Sixth Circuit.

Oct. 9, 2002.

<br>

Before BOGGS and BATCHELDER, Circuit Judges; and STEEH,* District Judge.

PER CURIAM.

Defendants appeal the district court's award of ERISA retirement benefits to plaintiff as well as the district court's refusal to require plaintiff to execute a standard waiver form to receive the equitable

award of retirement incentive program benefits. Plaintiff cross-appeals the district court's dismissal of his age discrimination claim and a finding of non-liability for an alleged breach of ERISA fiduciary duty to timely and accurately inform him that he was not entitled to bridge his seven years of prior service. For the reasons that follow, we AFFIRM.

## I. Background

Plaintiff Stephen McGrath began working as a structural engineer for Lockheed–Georgia in Marietta, Georgia, in 1964 until he was laid off in 1970. In 1974, plaintiff began working for the Union Carbide Corporation in Oak Ridge, Tennessee. The Martin Marietta Corporation later acquired Union Carbide's Oak Ridge operations. In 1995, Martin Marietta merged with the Lockheed Corporation, forming defendant Lockheed Martin Corporation ("LMC"), of which defendant Lockheed Martin Energy Systems ("Energy Systems") is a subsidiary. Energy Systems operates government-owned facilities in Oak Ridge, Tennessee, pursuant to contracts with the United States Department of Energy ("DOE").

In 1995, Energy Systems' Central Engineering Services ("CES") was made up of nine organizations managed by Director Phillip Thompson. One of the nine organizations within CES was Mechanical and Manufacturing Engineering ("MME"), headed by Director Thomas Smith. MME consisted of seven departments including Mechanical Equipment Design ("MED"), headed by Byron Singletary. Plaintiff worked for Singletary in MED.

In December 1995, plaintiff began corresponding with Energy Systems Benefit

---

* The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

Plans Administrator Harriet Westmoreland, asking that his seven years of prior service at Lockheed–Georgia be added to his 21 years of credited service at Energy Systems under the defendant Restated Retirement Program for Employees of Martin Marietta Energy Systems, Inc. ("ES Plan"). Westmoreland responded in March 1996 that all requests for restoration of prior service are "on hold until we receive a directive from the Corporate office", and that "[d]ue to the complexity of the service restoration issue, this review could take some time before a final decision is made." Plaintiff continued making inquiries, and on May 9, 1996, Westmoreland responded by e-mail:

> According to the Corporation, no former Lockheed service is being restored. We have sent a draft to the Corporation to approve "words" to publish to try to explain why this is not being done. It may be in the future, but not the near future. All of it is being tied up because of language in the Lockheed pension plan.

Two days earlier, on May 7, 1996, and unbeknownst to Westmoreland, LMC Director of Pension Operations Ray Niznik sent a memorandum to Bob Brown in Human Resources concerning a "Lockheed Martin Bridging Rules/Meeting Agenda for 5/8." Attached to the memorandum was a document titled "BRIDGING OF PENSION SERVICE", which had been revised by Niznik on May 5, 1996. According to LMC's Director of Benefit Compliance and Audit Clare O'Callaghan, the May 5, 1996 document later became LMC policy. On June 13, 1996, Westmoreland transmitted an e-mail to plaintiff and all "Employees Who Have Requested Aggregation of Former Lockheed Service":

> I talked with Lockheed Corporate Human Resources last week to ascertain what progress had been made on the aggregation of Lockheed service and Martin Marietta service. I was told that no pension service was being aggregated at this time except for the purpose of vesting.....

> The Corporation could give me no idea of when a decision would be made, but our guess is that it will be another 3 years before we recognize any Lockheed service due to certain clauses in the Lockheed pension plan. It is under study at this time. Due to the complexity of the service restoration issue, a thorough review is still underway and the guidelines will be issued when the review is complete.....

On another front, Energy Systems issued a letter on June 24, 1996 announcing an August 1996 retirement incentive program, attached to which was an application form and a "General Release and Waiver" form. The retirement incentive program added five years of company service for purposes of calculating an eligible employee's ES Plan pension benefits, and paid the eligible employee a $5,000.00 lump sum. To receive these enhanced benefits, an eligible employee was required to execute the "General Release and Waiver." By e-mail dated July 25, 1996, plaintiff informed Westmoreland that he would accept the retirement incentive program benefits, but only if he received credit for his seven years of service at Lockheed–Georgia. Westmoreland e-mailed plaintiff the same day stating that an answer to his request for seven years of additional credited service could be available in another two years. By letter dated July 29, 1996, plaintiff's counsel William Mason asked Westmoreland "to send a copy of the Lockheed pension plan...." Westmoreland responded by letter dated August 6, 1996:

As we discussed by telephone last week, Mr. McGrath has not been denied his former Lockheed service. Due to some provisions within the Lockheed pension plan at the time of the merger, the Corporation is unable to aggregate former Lockheed service. As stated in my correspondence with Mr. McGrath and the other employees who have requested this service, it may be as long as 2–3 additional years before this situation is resolved and then, we don't know how it will be resolved. We are keeping a file on everyone and checking periodically with the Corporation to ascertain if any progress is being made.

In response to your second concern, if Mr. McGrath chooses to terminate under the current Retirement Incentive Program and then a later favorable decision is rendered in behalf of employees such as Mr. McGrath, his prior Lockheed service would not be restored. This service would only be restored to him if he was on active payroll at the time this decision is made.

On August 21, 1996, Attorney Mason reiterated his request for "a copy of the Lockheed Martin Pension Plan, including the provision which prevents [Energy Systems] from aggregating Mr. McGrath's service." By letter dated August 28, 1996, Mason confirmed receipt of a copy of LMC's annual report, and once again requested "a copy of the pension document."

In the interim, plaintiff submitted an August 19, 1996 application for the retirement incentive program with a preferred termination date of August 29, 1997, also including the limitation that "I will accept this offer only on the condition that my seven (7) years previous Lockheed service is added to my current twenty-two (22) years service." Plaintiff's preferred termination date was approved on August 26,

1996. Plaintiff e-mailed Westmoreland the next day, asking if the approval of his preferred termination date meant that he had been credited with his seven years of service at Lockheed–Georgia. On August 29, 1996, plaintiff withdrew his application, stating:

> I reserve my rights to pursue the grant of prior service credit, and the incentives (5 years service & $5,000) offered with the 1996 early retirement program which I am losing by not being able to retire now with the service credit to which I am entitled.

On yet another front, CES management decided that another reduction in force (RIF)[1] was required to meet budget constraints. Energy Systems had adopted a written "Process For Involuntary Reduction In Force" in May 1994, which was revised in 1996. Management was first required to determine the number of excess full-time-equivalent employees, and to apportion this excess across all organizations. "Organizational Managers" were then to "determine positions subject to RIF, based on an assessment of the skills/personnel requirements necessary to accomplish organizational objectives in support of the mission." "Peer groups" of employees were then to be constructed, with an initial ranking of the employees within a given peer group. Rankings were to be based on: (1) possession of critical skills; (2) performance reviews over the past three years; (3) education/training relevant to the job; (4) transferability of job skills; (5) length of service with the company, and; (6) time in position. "Layoff Comparison Forms" were then to be completed, "compar[ing] employee to be RIFed with peers (list peers in order low-high) to be retained." A "RIF Review Board" was then required to review and

---

1. The earlier RIF was referred to as the August 1996 RIF.

evaluate individual RIF decisions. Layoff Comparison Forms, layoff lists, and "Summary Forms" were to be submitted to the RIF Review Board in advance of Board meetings.

Singletary identified plaintiff as one of two candidates for layoff in the MED department. Singletary explained that he identified plaintiff as a RIF candidate "based solely on the lack of work in the area of finite element analysis[2] ("FEA") which was the area of technical expertise that I associated with McGrath." Singletary further explained that "[t]he preponderance of projected work was in design." MME Director Smith met with Singletary and other managers to construct a peer group for plaintiff, with Smith commenting that plaintiff "was really like a peer group of one" due to his specialization in FEA. A Layoff Comparison Form was prepared on November 5, 1996 for a peer group of four Grade 11 Engineering Specialists within MME: (1) plaintiff; (2) C.C. Wynn; (3) R.W. Mouring, and; (4) J.W. Stapleton. Plaintiff was listed as the lowest ranking peer and, thus, the layoff candidate. The RIF Review Board approved plaintiff as an appropriate layoff candidate on November 7, 1996. A one-page memorandum was also prepared to support the decision:

> Mr. McGrath specializes in structural analysis and has little experience in general engineering and design applications. With loss of workload, we do not have enough specialized analysis work to support Mr. McGrath. His skills are much less transferrable to other work in his department than those of his peers.....

> Mr. McGrath has very specialized analytical skills and has not been able to demonstrate the ability to do conceptual and detailed design work.

> Mechanical Engineering does not have enough specialized finite element analysis to support Mr. McGrath.

> All of Mr. McGraths' [sic] peers are in the same general age and company service bracket, but have demonstrated capability in performing a broad variety of engineering applications.

This memorandum was prepared after the November 7, 1996 presentation to the RIF Review Board. Plaintiff received notification of his permanent layoff on November 22, 1996. Plaintiff met with Singletary and MME Director Smith on December 3, 1996 to discuss the reasons he was chosen for layoff.

On December 31, 1996, plaintiff wrote a letter to Westmoreland asking her to "accept this as my application for an immediate benefit commencing upon my lay off[sic] from Lockheed Martin effective January 31, 1997, calculated on approximately 34 years of service." Plaintiff also informed Westmoreland that "my attorney's August 28, 1996, letter renewing his request for a copy of the pension plan has still not been answered." Plaintiff reiterated his request "for the same document a copy of the Lockheed Martin Pension Plan, including the provision which states that no decision can be made on granting me prior service credit." Westmoreland responded in a January 24, 1997 letter that plaintiff was not being credited for his

---

**2.** Singletary explained that "finite element analysis" answers the design questions: "will it work, will it bend, will it break, will it explode? And that's the question McGrath is trained to answer." Singletary continued that, in performing FEA, plaintiff "would be analyzing an existing configuration and recommending changes needed to make it work

in the place where it's supposed to work." Singletary distinguished FEA as being part of the overall design process: "Design is a—design started a lot sooner than [FEA]. Design started with words, with conversations, and evolved into an object. And it's the object that [plaintiff McGrath] works on."

seven years of prior service with Lockheed–Georgia, that the pension plan prohibits aggregation of pension service "for five years from the date of acquisition", that plaintiff was not entitled to enhanced pension benefits because he withdrew his application, that requests for pension plan documents "must come from you and not your attorney", and that the request for pension plan documents should be made to Ray Niznik. Plaintiff received a copy of ES Plan documents from Energy Systems Pension Plan Director Norman Sparks on February 11, 1997.

On February 25, 1997, plaintiff wrote to Energy Systems Human Resources Director Cleveland Jones, Jr. asking for a detailed explanation of why he was laid off, and for a list of other employees that were being laid off. Plaintiff also asked that he either be reinstated "or that my application for the 1996 Retirement Incentive Program be accepted based upon my total years of service with Lockheed–Martin, which is approximately 29." Jones responded in March 1997 that plaintiff was selected for layoff pursuant to a RIF process that applied six guidelines: possession of critical skills, performance reviews over the past three years, education/training relevant to the job, transferability of job skills, length of service with the company, and time in position. Jones denied plaintiff's requests for reinstatement and for a list of others who were laid off, and concluded by informing plaintiff that his claim for pension benefits under the retirement incentive program must be pursued through administrative channels as described in a benefits handbook. Plaintiff sent a second letter to Jones on April 8, 1997 again requesting documentation for his layoff. Jones forwarded plaintiff a copy of the written Process For Involuntary Reduction In Force on April 18, 1997.

Plaintiff filed a First Amended Complaint on September 15, 1999 in the United States District Court for the Eastern District of Tennessee alleging that he was laid off from Energy Systems in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"); that defendant ES Plan and defendant Committee for the Restated Retirement Program for Employees of Martin Marietta Energy Systems, Inc. ("Committee") violated section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), by refusing to credit him with his seven years of service at Lockheed–Georgia; that defendants LMC and Energy Systems violated section 510 of the ERISA, 29 U.S.C. § 1140, by discharging him in retaliation for attempting to enforce his right to seven years of additional credited service; that the defendants violated section 502(c)(1) of the ERISA, 29 U.S.C.A. § 1132(c)(1), by failing to timely provide plaintiff with pension plan documents, subjecting the defendants to $100.00 per day penalties, and; that the defendants breached fiduciary duties and violated section 502(a)(3) of the ERISA, 29 U.S.C.A. § 1132(a)(3), by providing inaccurate and untruthful information about "bridging" his seven years of service at Lockheed–Georgia.

On March 31, 2000, District Judge Leon Jordan granted, in part, defendants' motion for summary judgment as to plaintiff's ADEA claim and ERISA section 510 retaliation claim, as well as to plaintiff's ERISA section 502(a)(3) breach of fiduciary duty claim as alleged against defendant LMC only. Plaintiff agreed to abandon his ERISA section 502(a)(1)(B) claim of wrongful denial of seven years credited service with Lockheed–Georgia. Summary judgment was denied, in part, as to plaintiff's ERISA section 502(c)(1) claim for $100.00 per day penalties, and plaintiff's ERISA section 502(a)(3) breach of

fiduciary duty claims as alleged against defendants Energy Systems, ES Plan, and the Committee. Following a non-jury trial, the district court ruled on October 25, 2000 that: the defendants were liable under ERISA section 502(a)(3) for $7,700.00 in monetary penalties[3] for failing to timely respond to plaintiff's July 29, 1996 request for plan documents; the defendants Energy Systems, ES Plan, and the Committee were liable for breach of fiduciary duty under ERISA section 502(a)(3) for informing plaintiff that he had to be on "active payroll" to remain eligible for the seven years credited service he was seeking, and; the defendants Energy Systems, ES Plan, and the Committee did not breach an ERISA fiduciary duty to timely and accurately inform plaintiff that he would not be credited with his seven years of service at Lockheed–Georgia. The district court determined that plaintiff was entitled to restitution under his successful breach of fiduciary duty claim, awarding plaintiff the benefits he would have received under the retirement incentive program had he not withdrawn from the program based on misinformation that he would have to remain on active payroll to remain eligible for additional credited service. The district court also found that plaintiff was not required to sign the General Release and Waiver form to receive the awarded retirement incentive program benefits.

Plaintiff cross-appeals the district court's ruling granting defendants' motion for summary judgment as to his ADEA claim, and the district's court's bench trial ruling that defendants Energy Systems, ES Plan, and the Committee did not breach an ERISA fiduciary duty by representing prior to August 29, 1996 that a decision had not yet been made whether

he could qualify to be credited under the ES Plan for his seven years of service at Lockheed–Georgia. Defendants appeal the district court's bench trial rulings: that Energy Systems, ES Plan, and the Committee breached a ERISA fiduciary duty by misrepresenting to plaintiff that he would need to remain on "active payroll" to benefit from any future decision regarding his request for seven additional years of credited service; that plaintiff is not required to sign the standard waiver form to receive restitution, and; that the defendants are liable for $7,700.00 in penalties under ERISA section 502(c)(1).

## II. Summary Judgment of ADEA Claim

This court reviews a district court's grant of summary judgment *de novo*. *Strouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 341 (6th Cir.2001). Summary judgment is appropriate under Rule 56(c) "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." This evidence and all reasonable inferences arising therefrom must be construed in a light most favorable to the nonmoving party. *Strouss*, 250 F.3d at 341 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). For the plaintiff to prevail on a claim, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

**3.** The $7,700.00 penalty was calculated as $50.00 per day times 154 days, measured by a delay from August 23, 1996, thirty days after plaintiff's counsel requested plan documents, to January 24, 1997.

242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The district court granted summary judgment in favor of the defendants as to plaintiff's ADEA claim, finding initially that plaintiff produced sufficient evidence to support a prima facie case of age discrimination: plaintiff was over 40 years of age (age 57) at the time of the RIF; plaintiff was qualified to perform the job; plaintiff was discharged, and; there was additional circumstantial evidence to indicate that plaintiff was singled out for discharge for impermissible reasons. *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir.1998). The district court also found that the defendants met their burden of production by coming forward with legitimate, non-discriminatory reasons for choosing plaintiff for the layoff. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Reasoning that the presumption of age discrimination had now "fall[en] away", the district court continued that plaintiff was now required to produce evidence showing that the defendants' proffered legitimate reasons for plaintiff's discharge "were not the real reasons for choosing him for the lay off; rather, he was chosen because of his age." The district court concluded that plaintiff failed to produce sufficient evidence that age was a factor used in the layoff decision, and granted summary judgment in favor of the defendants, citing *Skalka v. Fernald Envtl. Restoration Mgt. Corp.*, 178 F.3d 414, 420–21 (6th Cir.1999) and *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990).

Plaintiff argues on appeal that the district court erroneously applied a "pretext plus" standard by requiring plaintiff to show both that the legitimate reasons proffered by the defendants were false and a mere pretext for age discrimination, plus that the defendants were motivated in their layoff decision by age bias. Plaintiff primarily relies upon *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) for the proposition that the evidence supporting his prima facie case and the following evidence of pretext warrants submitting the ultimate issue of intentional age discrimination to the jury: (1) defendants relied on budget cuts in environmental restoration and waste management projects to justify the RIF even though plaintiff never worked on such projects; (2) defendants have not produced CES's projected workload or CES's mission objectives in justification of the RIF; (3) defendants have not produced evidence explaining CES Director Thompson's decision to eliminate five positions in MME; (4) plaintiff was told by Singletary in early 1996 that there was plenty of FEA work to do; (5) plaintiff's professional training and experience demonstrates plaintiff had transferable engineering design skills, contrary to his peer group evaluation; (6) plaintiff was told at his December 3, 1996 meeting with Singletary and MME Director Smith that he was chosen for layoff due to plaintiff's small billable workload and low percentage of funded work even though funding for a superconducting magnet FEA analysis became available in August 1996; (7) all of the employees in plaintiff's peer group did not perform FEA; (8) three employees within plaintiff's organization (MED)— Steve Chae, John Platt, and Dave Richards—performed FEA work but were not included in plaintiff's peer group; (9) 18 engineers younger than plaintiff that performed FEA work were not included in plaintiff's peer group; (10) plaintiff's peer group contained employees outside of plaintiff's department (MED); (11) plaintiff's peer group contained only Grade 11 engineers even though the written RIF process permitted plaintiff to be compared

with non-at-risk Grade 9 engineers; (12) Grade 9 engineer J.E. Brewer, over age 50, was approved for layoff on November 7, 1996 for *not* having specialized skills, and his peer group contained Grade 9 and Grade 11 engineers; (13) one month after plaintiff was terminated, Engineer Len Phillips was asked to perform 700 hours of FEA work within MME, and; (14) the one-page memorandum supporting the RIF decision was prepared after the RIF Review Board approved plaintiff's layoff on November 7, 1996.

Months after the district court's decision, the Supreme Court reiterated the holding in *St. Mary's Honor Center* that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097 (emphasis added). The Supreme Court explained further, however, that a plaintiff's showing of pretext will not sustain a verdict of liability "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id*, at 148. *Reeves* reaffirmed that the probative value of pretext evidence may or may not permit the trier of fact to conclude that the employer unlawfully discriminated against the employee. *See Ross v. Campbell Soup Co.*, 237 F.3d 701, 708–09 (6th Cir.2001) (reversing grant of summary judgment under ADA case where evidence of pretext also evidenced discrimination based on perceived disability).

*Reeves* did not involve a RIF. In RIF cases, the fourth element of the prima facie ADEA case—proof that the plaintiff employee was replaced by a younger person—is modified to require the plaintiff to offer "direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for impermissible reasons." *Skalka*, 178 F.3d at 420–21 (quoting *Barnes*, 896 F.2d at 1465). *See also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (reasoning that in RIF cases the fourth prong of a prima facie age discrimination case may be demonstrated by showing that a comparable non-protected employee was treated better). Modification of the fourth element in a RIF situation is required because, "[w]hen an employer is forced to reduce its staff for economic reasons, the most common legitimate reason for the discharge is the RIF itself." *Brocklehurst v. PPG Industries, Inc.*, 123 F.3d 890, 896 (6th Cir.1997) (citing *Barnes*, 896 F.2d at 1465 and applying federal law to Michigan age discrimination claim). "[T]he decision to discharge a qualified, older employee is not inherently suspicious" because "[i]n a RIF, qualified employees are going to be discharged." *Id.* (citing *Barnes*, 896 F.2d at 1466). Here, it is undisputed that budget cuts within the DOE forced Energy Systems to institute large-scale RIFs in the 1990s. CES's own headcount declined from 1041 in fiscal year 1992 to 519 by the end of fiscal year 1997. In such an economic environment, plaintiff's layoff does not of itself raise a legitimate inference that he was chosen for discharge due to his age. *Brocklehurst*, 123 F.3d at 896.

■ Coupled with the evidence used to support plaintiff's prima facie case, plaintiff's remaining evidence of pretext is extremely weak. Evidence that 18 engineers capable of performing FEA work were retained in the MME group, and that 17 of those engineers were younger than plaintiff, is not indicative of age discrimination considering the broad scope of the unchallenged RIFs, and the drastic shrinkage

occurring within CES since fiscal year 1994. *Brocklehurst,* 123 F.3d at 896. Further, plaintiff has not come forward with evidence that any of the 17 younger engineers were similarly situated. *See Ercegovich,* 154 F.3d at 352. Plaintiff's argument that the defendants failed to produce projected workloads, mission objectives, and evidence explaining CES Director Thompson's decision to eliminate five MME positions is misplaced as plaintiff bore the burden of persuasion that the defendants' proffered reasons have no basis in fact. *Taylor v. Union Institute,* 30 Fed.Appx. 443 (6th Cir.2002). Evidence that the one-page memorandum supporting the RIF decision was prepared after the RIF Review Board approved plaintiff's layoff likewise does not support a finding of age discrimination. *Hooper v. Cargill, Inc.,* No. 98–5870, 1999 WL 552560, *5 (6th Cir. July 23, 1999).

Plaintiff proffers other evidence in an attempt to demonstrate a conflict in the reasons given for his layoff. Evidence that Singletary told plaintiff in early 1996 that there was plenty of FEA work is temporally remote from the challenged November 7, 1996 layoff decision. The fact that FEA analysis work became available in August 1996, and that another engineer was asked to perform 700 hours of FEA work within a month after plaintiff was discharged, does not undercut that plaintiff was chosen for discharge because he limited his engineering work in the last three years of his career solely to FEA. Although plaintiff's professional background, training, and experience show that plaintiff possesses engineering design skills other than performing FEA, plaintiff has not proffered evidence indicating that, within the three years prior to the RIF evaluation, his demonstrated skills in design areas other than FEA were more transferable than the demonstrated skills of his peers Wynn, Mouring, and Staple-

ton. Grade 9 engineer Brewer was approved for layoff in November 1996 because he "does not possess needed skills in computer aided design, modeling and analysis, which is becoming key to Mechanical Engineering applications; engineers with less experience are proficient with these systems and have experience implementing them." Plaintiff was chosen for layoff because he "specializes in structural analysis", or FEA. Contrary to plaintiff's argument, there is no inconsistency in selecting Brewer for the RIF for lacking computer skills, and selecting plaintiff for the RIF because he specialized in FEA.

Plaintiff takes issue with his peer group, and the comparisons made within the peer group. Proof that the employer's explanations for its discharge decision are unworthy of credence is a form of circumstantial evidence that may support a finding of intentional discrimination "consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.' " *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097. In *Skalka,* the employer, a federal contractor, adopted a "forced ranking" RIF process whereby employees were placed into peer groups, and were evaluated by their supervisors to produce a ranked list. *Skalka,* 178 F.3d at 419. Top management decided which departments would lose employees, and the forced rankings were used to identify candidates for discharge. *Id.* The *Skalka* court determined that, with respect to lead plaintiff Robert Skalka, there was sufficient pretext evidence to support a jury's verdict of age discrimination: Skalka was the oldest member of his peer group and was chosen for layoff even though he was rated the most competent among his peers; the employer "lost" the peer group ranking forms; the employer deviated from choosing the least compe-

tent employee in the peer group by explaining that the supervisor ranking the peer group didn't know anything about their individual performances and Skalka's department didn't need an "RSO" notwithstanding that others in the peer group were also RSOs. *Id,* at 421–422. The *Skalka* court held that a reasonable jury could disbelieve the employer's explanations and find intentional discrimination in choosing Skalka for discharge, considering the employer had chosen employee skills as the RIF criteria and had formed the peer group in which Skalka received the best ranking. *Id,* at 421–422.

Plaintiff's proffered evidence with respect to his peer group is dissimilar to the evidence presented in *Skalka.* Plaintiff was rated last among his peers, and was accordingly chosen for layoff. Each of plaintiff's peers was in the protected age group: plaintiff (age 57), Wynn (age 53), Mouring (age 60), Stapleton (age 58). Plaintiff was not chosen for discharge because of his position as an Engineering Specialist Grade 11, a position shared by each of the other members of his peer group, but because he, unlike his peers, specialized in performing FEA work. Plaintiff has not come forward with evidence that another engineer in CES specialized in FEA. The written RIF process did not require Grade 9 engineers to be included in plaintiff's peer group. The evidence relating to plaintiff's peer group does not raise a legitimate inference of "affirmative evidence of guilt." *Reeves,* 530 U.S. at 147, 120 S.Ct. 2097.

Reviewing the evidence and all reasonable inferences arising therefrom in a light most favorable to plaintiff, plaintiff's prima facie case and proffered pretext evidence is insufficient to support a finding of age discrimination as a matter of law. *Strouss,* 250 F.3d at 341; *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. The district court's

grant of summary judgment will be affirmed.

### III. ERISA Rulings Following Bench Trial

A district court's findings of fact following a bench trial are reviewed by this court under a clearly erroneous standard. *Burzynski v. Cohen,* 264 F.3d 611, 616 (6th Cir.2001). A district court's findings of fact are clearly erroneous if the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made. *Hamilton v. Carell,* 243 F.3d 992, 997–98 (6th Cir.2001). As long as the district court's view of the evidence is "plausible in light of the entire record, it must stand, even though the reviewing court, had it been the finder of fact, might have judged the same evidence differently." *Id.* A district court's conclusions of law following a bench trial are reviewed *de novo. Id.*

#### A. ERISA Duty of Accurate Disclosure

Plaintiff argues that the district court erred by ruling that defendants Energy Systems, ES Plan, and the Committee did not breach an ERISA fiduciary duty by representing prior to August 29, 1996, the date plaintiff withdrew his retirement application, that no decision had yet been made whether plaintiff would be credited under the ES Plan with his seven years of prior service at Lockheed–Georgia. Defendants argue the district court erred by ruling that defendants Energy Systems, ES Plan, and the Committee breached an ERISA fiduciary duty by representing that plaintiff would need to remain on "active payroll" status to benefit from any future decision regarding plaintiff's seven years of service at Lockheed–Georgia.

An ERISA fiduciary owes a duty to provide complete and accurate information in responding to a plan participant's ques-

tions. *Krohn v. Huron Memorial Hospital*, 173 F.3d 542, 547 (6th Cir.1999) (quoting *Drennan v. General Motors Corp.*, 977 F.2d 246, 251 (6th Cir.1992)). Misleading communications to plan participants will support an ERISA breach of fiduciary duty claim regardless of whether they were made negligently or intentionally. *Id.* (quoting *Drennan*, 977 F.2d at 251 and citing *Berlin v. Michigan Bell Telephone Co.*, 858 F.2d 1154, 1162 (6th Cir.1988)). ERISA fiduciary duty provisions incorporate the common law of trusts, and the "duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Id.*, at 548 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) and quoting *Bixler v. Central Pa. Teamsters Health and Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir.1993)).

### i. "Bridging" Statements

■ The district court found that Westmoreland's representations to plaintiff, that no decision could yet be made whether plaintiff was entitled to "bridge" his seven years of prior service at Lockheed–Georgia, could not have misled plaintiff because the May 5, 1996 "BRIDGING OF PENSION SERVICE" memorandum, providing rules for crediting prior service, did not become finalized until "the second half of 1996" as attested to by LMC's Clare O'Callaghan. The district court also found that, "[b]ased on the testimony before the court, it appears that the 'bridging' document applied to Lockheed and Martin Marietta retirement plans, but it did not address issues related to the Energy System retirement plan."

The district court's conclusion that rules for crediting prior service did not become finalized until "the second half of 1996" is not clearly erroneous. O'Callaghan's testimony supports the district court's finding that the policy in the memorandum was not adopted until "the second half of 1996", and after plaintiff withdrew his retirement application. Plaintiff's argument that various representatives of the defendants admitted that plaintiff was not entitled to bridge his seven years of service with Lockheed–Georgia under the terms of the May 5, 1996 memorandum misses the district court's point that, assuming the memorandum applies to plaintiff's ES Plan service, the policy was not adopted and fully implemented until after plaintiff withdrew his retirement application.

The district court's finding that "it appears that the 'bridging' document applied to Lockheed and Martin Marietta retirement plans, but it did not address issues related to the Energy System retirement plan", is also not clearly erroneous. O'Callaghan testified that LMC Director of Pension Operations Ray Niznik drafted the May 5, 1996 memorandum for a meeting to be held with Bob Brown, a representative of LORAL.[4] Based on O'Callaghan's testimony, the district court could plausibly conclude that the May 5, 1996 memorandum did not apply to plaintiff's ES Plan, and therefore proof of misrepresentations by Westmoreland could not be premised upon the May 5, 1996 memorandum.

The district court's ultimate conclusion that defendants Energy Systems, ES Plan, and the Committee did not breach an ERISA fiduciary duty by making misleading statements about the timing of a decision regarding plaintiff's bridging rights under the ES Plan is not clearly erroneous

---

4. The identity of "LORAL" is unclear from the record. Defendants refer to LORAL in their July 10, 2001 Brief as the "acquiring corporation."

nor contrary to law. *Burzynski,* 264 F.3d at 616; *Hamilton,* 243 F.3d at 997–98. The finding will be affirmed.

### ii. "Active Payroll" Statements

The district court determined that Westmoreland's August 6, 1996 letter, informing plaintiff that if he "chooses to terminate under the current Retirement Incentive Program and then a later favorable decision is rendered in behalf of employees such as Mr. McGrath, his prior service would not be restored", and that "[t]his service would only be restored to [plaintiff] if he was on active payroll at the time the decision is made", was both false and misleading. The district court also concluded from plaintiff's trial testimony that he would not have withdrawn his retirement incentive plan application if not for this misrepresentation. Defendants do not dispute that Westmoreland's "active payroll" statements were incorrect, and concede that plaintiff was not required to remain on "active payroll" status to benefit from a favorable bridging decision.

■ Instead, defendants argue that the district court erred in the absence of proof that Westmoreland *knowingly* deceived plaintiff, citing *Muse v. International Business Machines,* 103 F.3d 490 (6th Cir. 1996). *Muse* involved an employer's duty not to make material misrepresentations to plan participants after giving "serious consideration" to plan changes, with the court commenting: "The law is not well-developed, however, with respect to whether fiduciaries must disclose plan changes that have been proposed or considered but not yet implemented." *Id* at 493. Westmoreland's "active payroll" misrepresentation did not relate to a considered change in the ES Plan, as did the misrepresentation in *Muse.* Pursuant to the more recent decision in *Krohn,* Westmoreland's misrep-

resentations concerning an "active payroll" requirement support an ERISA breach of fiduciary duty claim whether the statements were negligently, intentionally, or knowingly made. *Krohn,* 173 F.3d at 547. The district court did not err by finding that defendants Energy Systems, ES Plan, and the Committee breached an ERISA fiduciary duty by representing that plaintiff would need to remain on "active payroll" status to benefit from any future decision regarding his request to bridge his prior seven years of service at Lockheed–Georgia. The finding will be affirmed. *Burzynski,* 264 F.3d at 616; *Hamilton,* 243 F.3d at 997–98.

### B. ERISA Restitution of Benefits as Equitable Relief

■ Defendants argue the district court erred by not requiring plaintiff to execute the "General Release and Waiver" form before awarding plaintiff the retirement incentive program benefits he would have received had he not withdrawn his application due to Westmoreland's "active payroll" misrepresentation. Defendants assert plaintiff would have been required to sign the waiver had he not withdrawn the application, and therefore he has been made "more than whole", citing *Howe v. Varity Corporation,* 36 F.3d 746, 756 (8th Cir.), *aff'd,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), for the proposition that a party receiving restitution for breach of an ERISA fiduciary duty should "be restored to the position they would have occupied if the misrepresentations ... had never occurred." The district court could logically conclude that plaintiff would not have been "made whole" after this protracted lawsuit by being forced to waive his right, for example, to recover a statutory penalty under ERISA. The district court did not err.

## C. ERISA Statutory Penalty Liability

Defendants argue the district court erred in awarding plaintiff $7,700.00 in ERISA statutory penalties, at $50.00 per day for a delay of 154 days, because: (1) plaintiff asked for Lockheed Martin plan documents instead of ES Plan documents, and therefore the ES Plan fiduciary should not be penalized for failing to timely deliver Lockheed Martin plan documents; (2) plaintiff was not prejudiced by the delay in his administrative pursuit of ES Plan benefits, and; (3) there was no showing that the defendants acted in bad faith.

▇ A district court's decision to award a monetary penalty under ERISA section 502(c)(1)(B) is reviewed only for an abuse of discretion. *Bartling v. Fruehauf Corp.,* 29 F.3d 1062, 1068 (6th Cir.1994). "An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *Id.* Westmoreland testified that she was an appropriate person for Energy Systems employees to ask questions about their retirement benefits. Consequently, Westmoreland owed plaintiff a fiduciary duty to provide complete and accurate information. *Krohn,* 173 F.3d at 547. Even negligence in responding to a retirement plan participant's request for plan documents constitutes breach of an ERISA fiduciary duty. *Id.* ERISA section 502(c)(1)(B) requires a plan administrator "to comply with a request for any information which such administrator is required by this subchapter to furnish." Plaintiff asked for a copy of "the Lockheed pension plan" on July 29, 1996. As between plaintiff and fiduciary Westmoreland, the district court could reasonably concluded that Westmoreland was in the better position to determine the appropriate plan documents. Westmoreland did not inform plaintiff that he was asking for the incorrect documents, nor did she send plaintiff a copy of another pension plan.

Instead, Westmoreland sent plaintiff a copy of LMC's annual report. The district court did not abuse its discretion in determining that Westmoreland failed to comply with plaintiff's repeated requests for ES Plan documents as proscribed by ERISA section 502(c)(1)(B). In awarding the $7,700.00 in penalties, the district court was not required to make a finding that plaintiff's right to administratively appeal ES Plan benefit decisions was prejudiced, or that Westmoreland acted in bad faith. We are not persuaded that the district court clearly erred in awarding an ERISA penalty of $7,700.00.

## III. Conclusion

The judgment of the district court is AFFIRMED in its entirety.