NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0153n.06
Filed: March 18, 2008

No. 06-6319

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DOYLE MYNATT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United |
| | ) | States District Court for the |
| LOCKHEED MARTIN ENERGY SYSTEMS, | ) | Eastern District of Tennessee |
| INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: BOGGS, Chief Judge; and BATCHELDER and GRIFFIN, Circuit Judges.

Per Curiam. Plaintiff Doyle Mynatt appeals the district court's grant of summary judgment for defendant Lockheed Martin Energy System, Inc. (LMES) in his employment discrimination suit brought pursuant to 42 U.S.C. § 2000e et seq. (Title VII) and 42 U.S.C. § 1981. In September 1999, Mynatt was terminated from LMES as part of a reduction-in-force (RIF), and he subsequently sued LMES, claiming that it terminated him and failed to promote him because he is African-American, created a hostile work environment, and paid him less than a white coworker. Mynatt withdrew his failure-to-promote claim, and the district court granted summary judgment for LMES on the termination, hostile-work-environment, and pay-discrimination claims. On appeal, Mynatt contests only the district court's rulings on his termination and pay-discrimination claims. Although Mynatt

alleges that the circumstances surrounding his termination show that racial animus motivated the decision to terminate him, that contention is without merit. Mynatt's pay discrimination claim is also unsubstantiated and is barred by the Supreme Court's holding in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162 (2007). Accordingly, we affirm the district court's grant of summary judgment for LMES.

## I. Background

### A. General Background

Beginning April 1, 1984, pursuant to a contract with the Department of Energy (DOE), LMES managed three government-owned nuclear facilities at Oak Ridge, Tennessee. Between January 1, 1996, and November 1, 2000, other companies assumed management of all three facilities, and, as of November 1, 2000, the work of LMES at Oak Ridge ended.

Mynatt received a Bachelor of Science degree in Communication from the University of Tennessee in 1979. Thereafter, he worked as a radio announcer and a TV reporter. In 1980, he was hired as a security inspector with Union Carbide Corporation, predecessor to LMES. He then became a material dispatcher in the Weapons Material Management Department, a weekly salaried position that he held for nine months. In 1984, he became a video aide in the video department in what eventually became Information Management Services (IMS).

Mynatt's initial job in IMS was video aide, a weekly salaried position. In 1989, his position was reevaluated as video associate, a monthly salaried position. In 1990, Mynatt was promoted to Video Producer I. In that position, he produced and directed videotaped programs for DOE facilities at Oak Ridge. He retained that position until his termination in September 1999. At the time of his

termination, Mynatt's position was titled Media Producer II, salary grade 3.

### B. The Reduction In Force (RIF)

It is undisputed that DOE budget cuts resulted in decreased funding for LMES's work. The RIF process began with the LMES finance organization's notifying each employment unit, including IMS, of the amount by which each unit would need to reduce its force, in dollar terms. Under the established RIF process, supervisors first establish peer groups of those employed in positions that may be subject to the RIF. Peer groups are identified by "determining impacted positions with the same or similar skill requirements and/or other positions in the same job family or classification." Elsewhere, LMES policy defines a peer group as being "[t]ypically composed of employees performing the same or similar types of work (usually in the same job family or classification) within the impacted organization." Examples of how to compose a peer group suggest that individuals with special skills should not be placed in peer groups with others who lack those special skills.

Next, managers determine which employees within each peer group will be terminated. Each employee in a given peer group is ranked based on consideration of six factors. Those factors include: possession of critical/essential skills, length of credited service with company, performance reviews over the prior three review periods, transferability of job skills, education/training relevant to work to be performed, and time in current position. Based on those factors, candidates for layoff are identified. The layoff candidates and other members of the peer group are then compared on a Layoff Comparison Form, which compiles peer group members' information along several dimensions, including the three most recent performance ratings, time in position, years of service,

age, race, sex, and education. Managers must also indicate the overall reason for selecting the layoff candidates for termination. On a separate Peer Comparison Profile form, peer group members' skills, transferability of skills, and job-related education are compared. For employees in protected categories, a detailed justification for their selection for termination is required. Unit representatives submit this documentation to a RIF Review Board (the "Board") and appear before the Board to explain the layoff selections.[1] In addition, an "adverse impact" analysis of all proposed terminations is conducted by the Workforce Diversity office. Once a selection is approved by the Board, the selections are reviewed with the human resources and legal departments. The employees selected are then notified of their termination.

At the time of his termination, Mynatt had three levels of supervisors. John Ridley was Manager of the Video Department and Mynatt's first-line supervisor. Mike Shepherd was Supervisor of Multimedia Services. Shepherd reported to Donna Griffith, Director of IMS. Ridley, Shepherd, and Griffith participated in the decision to select Mynatt for termination as part of the RIF.

Based on directives from LMES's finance department, Griffith, Shepherd, Ridley, and LMES finance personnel determined that one Producer/Director and one Video Assistant would be laid off from the Video Department. Mynatt and Walter Corey, also a producer in the Video Department, had the same position, Media Producer II, and were both in salary grade 3. Mynatt and Corey were placed in the Media Producer II peer group. John Buck, also a Media Producer II, was not included

---

[1] The RIF Review Board comprises a senior human resources manager, line manager, staffing manager, human resources generalist, workforce diversity representative, and compensation representative.

in the peer group. The reasons why Buck was not included are heavily disputed. Mynatt contends that the exclusion of Buck, who is white, is evidence of racial animus in the RIF process. LMES contends that Buck was excluded because his work and salary grade were dissimilar: he spent sixty percent of his time directing the company's teleconferencing program and was in salary grade 5. These arguments are addressed below. *See* discussion *infra* at pp. 13-14.

A Layoff Comparison Form for Mynatt and Corey was completed and indicated that Mynatt had received performance ratings of CM (meaning "consistently meets" position requirements) in each of the prior three evaluation periods, while Corey had received a higher rating of CX (meaning "consistently exceeds" position requirements) in 1998 and ratings of CM in the other two periods. The form indicated that Mynatt had spent fifteen years in his current position, while Corey had spent eighteen years in his current position. Mynatt had nineteen years of service, while Corey had eighteen years of service. Corey is identified as a white male. Both had Bachelor of Science degrees.

On the Peer Comparison Profiles form, the entry for Mynatt under "Possession of Critical/Essential Skills" stated: "Performs routine video work and projects of low to moderate complexity. Technical skills adequate for level of work performed. Has begun to learn new digital equipment." Corey's skills were described as: "Extensive experience in multiple camera production and live event staging. Possess[es] skills which are essential to maintaining functionality and continued technical operation of equipment used in production.[2] Handles complex productions and

---

[2]In his deposition, Shepherd testified that the department was dependent on Corey to repair equipment and that he possessed unique skills relating to that repair work.

interfa[ces] w/other technical resources." Under "Transferability of Skills," Mynatt's entry states:

"Present skills are job specific and pertain to routine work. Opportunities and training (internal and

external) have been provided for improvement." For Corey, the description is: "Essential skills to

support viability of the video/motion picture function and planned services to Defense Programs

technical lead for production equipment operations and interfaces with other media areas." Finally,

the "Job-related Education/Training" section notes that while Mynatt and Corey both had Bachelor

of Science degrees in Communication, Corey had worked for seven years in commercial television

production, compared to Mynatt's two years of experience before joining LMES.

Ultimately, Mynatt was identified as the layoff candidate on the Layoff Comparison Form,

and the reason given was:

> Loss of work from Bechtel Jacobs work authorizations and decreased funding from Defense Programs necessitates reducing the number of personnel in this function. When compared with peers, depth and breadth of skills is not as great despite being provided with opportunities. Candidate has not demonstrated initiative to work beyond the requirements of the job when compared with peers.

On September 7, Shepherd and Griffith presented Mynatt's name to the RIF Review Board,

which approved Mynatt's termination. Shepherd and Griffith then met with Mynatt and notified him

on September 8 that he would be terminated, effective November 12. Mynatt was one of eight IMS

employees, and one of two Video Department employees, who were terminated.

### C. Events Surrounding Mynatt's Termination

In arguing that racial animus thoroughly infected the RIF process, Mynatt places great weight

on a series of events surrounding his termination.[3] We recount those events below and address their

significance (or lack thereof) when we analyze Mynatt's claims. *See* discussion *infra* at pp. 14-15.

On August 31, 1999, John Buck, who also worked in the Video Department as a producer,

sent an email to Dr. Howard Friedman, company psychologist and chairman of the Threat

Assessment Team (TAT). The TAT was a group designed to respond to workplace threats, and

LMES employees were instructed to report any threatening behavior. The group consisted of

Friedman and representatives from the Labor Relations and Security Departments. In the email,

Buck stated that he had "a chance to review the potential list [of layoff candidates] and note that the

most likely person to be impacted is someone that has threatened several people in our department.

(Myself included) I believe I have a real concern that if this person is impacted he may turn violent."

The email elaborated that the "individual" had been a guard at LMES, owned several guns, knew

how to circumvent LMES security, and had a "personality that runs hot and cold." According to

Buck, "Our entire department walks on eggshells whenever he enters a conversation or we need to

work with him." Buck concluded, "I hope that this is all just an unnatural fear; however, I believe

that our supervisor might needs [sic] some type of session to tell him how to deal with our coworker

if he does get violent." Buck testified that he had not discussed the matter with anyone before

---

[3]Mynatt also emphasizes certain actions taken long after his termination. In particular, in May 2002, his re-hire status was changed to "ineligible for rehire," and Mynatt contends that this evidences racial animus in his termination. However, this change in status occurred more than two years after Mynatt's termination, and none of the managers who decided Mynatt's RIF were involved. Moreover, LMES had ceased managing the site as of November 1, 2000. There is no basis for concluding that LMES may be held liable for the conduct of a different entity's employees. *Cf. Whitmore v. O'Connor Mgmt., Inc.*, 156 F.3d 796, 799 (8th Cir. 1998) (finding no legal authority for holding a predecessor liable for the successor's discriminatory conduct).

sending the email.

On September 1, Friedman replied:

Given the information you have told me, I think that the supervisor and department head should meet with me to pursue this further. Please give me their names and I will contact them. Your name will not come up if you wish that confidentiality; I will however tell them the information I have been given.

In the meantime, Buck had forwarded his email to Shepherd and Ridley, adding that "I would hope this topic doesn't come as a complete shock to you . . . but I'm really worried about everyone's safety." Buck continued: "When the layoff slips are handed out, we have one effected [sic] person that is very likely to go out of control." Buck sent an email to Friedman identifying Shepherd and Ridley as his managers.

Later in the day on September 1, Friedman called Buck to ask him what had prompted the email. Buck identified Mynatt as the person he was describing in his email. Buck related an incident from the mid-1980s when he answered some calls to the office from Mynatt's wife. Buck testified that, on one occassion, he had joked with Mrs. Mynatt about whether she was Mynatt's wife or girlfriend. Later that day, according to Buck, Mynatt took him by the arm, led him outside, and screamed that he did not want Mrs. Mynatt thinking he was having an affair. Buck testified that he apologized profusely, but that Mynatt had stated, "I will get you" and "I will get you back." Mynatt allegedly added, "You won't know when and where it's gonna happen, but I will get you back." Buck testified that he reported the incident to Shepherd at that time.

Buck testified later that he also told Dr. Friedman about other incidents. First, another coworker had once told him that Mynatt had threatened him as well. Second, yet another coworker

had told him that Mynatt had threatened him in 1998. Third, Buck related that Mynatt would occasionally scream at Ridley, his supervisor. Buck testified that he did not speak to Friedman again about his concerns, subsequent to the initial emails and the phone conversation.

Friedman arranged a meeting with Ridley, Shepherd, and Griffith for September 3. Buck was to attend, but could not do so because he was working on a teleconference that could not be canceled. Shepherd testified that he and Griffith spoke by cell phone to Buck while they were en route to the meeting with Friedman. According to Shepherd, Buck said he had "done some figuring" on who was going to be laid off and that lead him to believe Mynatt would be laid off. Buck reiterated his concerns and told Shepherd that he knew of occasions when Mynatt had threatened others. Buck also said that Corey and others in the department were "scared of" Mynatt. Shepherd testified that when Buck told him this, he was aware that individuals in the department had complained to him that they did not want to work with Mynatt or "be close to" him. Shepherd testified that "color" was never mentioned in any of the conversations about Mynatt. At the meeting with Friedman, Shepherd related all of the incidents involving Mynatt of which he was aware. Griffith and Shepherd testified that they expected Friedman to decide what to do, if anything, in response to Buck's email.

A few days after their meeting, Friedman notified Shepherd and Griffith that he had discussed the situation with the TAT and told them how to proceed. Shepherd was to request that a security inspector be stationed nearby the office where Mynatt would get his notice of termination. At the conclusion of the meeting, Mynatt would be told to go directly to Friedman's office, and Friedman would discuss the accusations with Mynatt. On September 8, Shepherd followed these instructions, and Mynatt was escorted by security to Friedman's office after his notice meeting. Having gained

company approval to deny Mynatt access to secure areas following his layoff, Friedman asked Mynatt to surrender his badge. Mynatt was then told that he could use the career center, which was outside the secure area, and security guards escorted him there. Friedman then notified the plant shift superintendent that Mynatt's security access was revoked.

The shift superintendent had Mynatt's badge deactivated and posted Mynatt's photograph at the secure area's entry points. Charlie Miner, manager of the Labor Relations Department and a member of the TAT, testified that he and the security chief made the decision to post Mynatt's photograph. Miner testified that he routinely posted photographs in the guard shacks along the perimeter of the secure areas to ensure that certain people were not admitted. Friedman testified that he did not know Mynatt's photo would be posted. The photo of Mynatt showed his face, name, and badge number and stated that access was denied to all portals. At least one of the photos included a handwritten notation: "Individual has made verbal threats after receiving layoff notice." Another photo had been defaced with writing stating, "I want to whip J.E. Watts crazy, country RED NECK ASS!" An additional notation added "aka (Pissed Off)" next to Mynatt's name.

### D. The Response To The Tennessee Human Rights Commission

Mynatt filed a charge of discrimination with the Tennessee Human Rights Commission (THRC) in October 1999. James Barnes, head of Workforce Diversity at LMES, investigated the charge and submitted to THRC a letter on February 22, 2000, in which he stated that race had played no part in Mynatt's termination. In response to a request for further information, Barnes wrote on August 23, 2000, that Mynatt had been downsized "as part of a budget necessity." He also added:

> Approximately 2 to 3 days prior to the September 8, 1999, notification to employees selected for downsizing, Mr. Mynatt was overheard to make several threatening statements. Among these were, "If I receive a layoff notice, the next thing you will see is my picture in the papers and gun shoved up [my supervisor's] ass." "I have guns at home." "My Viet Nam days are coming back to me." "I know where you live." These threats were reported to Mr. Mynatt's management and to Dr. Howard Friedman, who is our Plant Psychologist and head of the Company's TAT.

Barnes described LMES's workplace violence policy and stated that employees could be escorted from the property if the individual was "reasonable believed to be potentially harmful to himself/herself, to others, or to company facilities . . . ." Barnes noted that since the creation of the policy, Mynatt and one other employee, a white male, had been escorted out of the plant. Barnes included a detailed description of the LMES RIF process, stating that Mynatt's position was eliminated because of a reduction in budget and that his managers had determined that his job could be eliminated or absorbed. Barnes also included the Layoff Comparison and Peer Comparison Profiles forms.

As Mynatt points out, Barnes's letter is not entirely accurate. The quotes to which Barnes refers in his letter were not discussed with Friedman or the TAT. In fact, they were reported by a Linda Cantrell to her supervisor on September 9, after Mynatt had received his layoff notice on September 8. According to Shepherd, Cantrell told him on September 9 that Mynatt had jokingly told her before the layoff that he would "have a gun shoved up [Shepherd's] ass." Cantrell told Shepherd that she did not initially report the threat because she was not sure she should get involved and thought that Mynatt was likely joking. Shepherd told Griffith about the threat and did not pursue the matter further. When Barnes was gathering information for the THRC, Griffith discussed the matter with him, and he then erroneously conflated that threat with the actual incident reported to

the TAT via Buck's email to Dr. Friedman.


## II.  Reduction In Force Claim

To establish employment discrimination, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory intent.  *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 514 (6th Cir. 2003).  The burden-shifting approach under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), which was later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), applies to the present case.  Under this framework, Mynatt faces the initial burden of presenting a prima facie case of discrimination. The establishment of a prima facie case creates a rebuttable presumption of discrimination and requires LMES to articulate some legitimate, nondiscriminatory reason for taking the challenged action.  LMES's burden is one of production only, not persuasion. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 599 (6th Cir. 2001) (citing *Burdine*, 450 U.S. at 253). The ultimate burden of persuasion remains with Mynatt.  *Ibid.*  If LMES produces legitimate nondiscriminatory reasons for terminating him, Mynatt must prove that LMES's reasons are a pretext for discrimination.  This same burden-shifting framework applies to both Title VII and § 1981 claims. *See Newman v. Federal Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989)).


### A.  Prima Facie Case

Absent direct evidence of discrimination, to establish a prima facie case in a wrongful

termination case, the plaintiff must establish: (1) that he is in a protected class; (2) that he was terminated; (3) that he was qualified for the job; and (4) that a similarly-situated person who was not in the protected class received the job. *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *see also McDonnell Douglas*, 411 U.S. at 802. In a RIF case, like this one, the fourth element of the prima facie case is modified to require the plaintiff to submit "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998)). Modification of the fourth element in a RIF situation is required because "[w]hen an employer is forced to reduce its staff for economic reasons, the most common legitimate reason for the discharge is the RIF itself." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 896 (6th Cir. 1997) (citing *Barnes*, 896 F.2d at 1465). It is undisputed that a RIF, in which "business considerations cause an employer to eliminate one or more positions within the company," occurred in this case. *Barnes*, 896 F.2d at 1465.

The district court held that Mynatt had "failed to present any evidence that his RIF selection was made because of his race." Mynatt argues that the failure to include Buck in the RIF peer group and the failure to terminate Corey indicate that racial animus motivated his termination. Mynatt also argues that the Buck email shows that he was chosen for termination because of his race. Mynatt's arguments are without merit.

The fact that Buck, who is white, was not included in the peer group does not suffice to show racial animus in this case. It is true that Buck and Mynatt were both titled "Media Producer II";

however, Buck spent 60% of his time on video teleconferencing and was a different salary grade. Under LMES's RIF policy, differences in job duties are a legitimate reason to exclude someone from a peer group. *See McGrath v. Lockheed Martin Corp.*, 48 F. App'x 543, 554 (6th Cir. 2002) (explaining that plaintiff could be placed in a one-person peer group because of his special skills). Moreover, a difference in salary grade suffices to define a peer group. *See Messner v. Lockheed Martin Energy Sys., Inc.*, 126 F. Supp. 2d 502 (E.D. Tenn. 2000) (holding that plaintiff failed to make prima facie case when peer group was based on job skills and salary grades); *Shapira v. Lockheed Martin Corp.*, 88 F. Supp. 2d 813, 824-25 (E.D. Tenn. 1998) (same). Thus, the failure to include Buck in the peer group does not provide any evidence that Mynatt was singled out because of his race.

Moreover, Mynatt's arguments that Corey should have been terminated are unavailing. A plaintiff's contention that he was better qualified than the workers who were retained is insufficient to establish a prima facie case. *See LaGrant v. Gulf & Western Mfg. Co., Inc.*, 748 F.2d 1087, 1091 (6th Cir. 1984). Moreover, an employee's evaluation of his own performance or qualifications is irrelevant as a matter of law. *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (stating that a plaintiff's "perception of his competence, and the incompetence of those competing against him, is irrelevant"). As one district court has noted, "it is the manager's motivation that is the key factor, not the employee's perception . . . ." *Shapira*, 88 F. Supp. 2d at 829. Thus, the fact that Mynatt believes Corey should have been terminated cannot establish a prima facie case.

Mynatt also points to the email from Buck to Dr. Friedman as evidence of racial animus. However, the email contains no reference to race whatsoever. Contrary to Mynatt's counsel's

protestations at oral argument, the mere supposition that Caucasian workers apply race-based stereotypes to their African-American coworkers cannot create a triable issue of fact that Mynatt was targeted because of his race. Such unsupported suppositions merely assume societal stereotyping and cannot overcome a complete lack of direct, circumstantial, or statistical evidence that Mynatt was treated differently because of his race. Accordingly, Mynatt has failed to meet the prima facie burden established for RIF cases. *See Barnes*, 896 F.2d at 1465.

### B. Pretext

Our holding that Mynatt failed to meet his prima facie burden is sufficient to affirm the district court's ruling. Thus, we need not address Mynatt's failure to show pretext.

### III. Pay Discrimination

Mynatt alleges that he was discriminated against in his compensation, because Corey, a white Producer/Director in the same salary grade, was paid more than he was. Appellant's Br. at 43-46. After the parties submitted their briefs, the Supreme Court decided *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S. Ct. 2162 (2007), the holding of which severely curtails Mynatt's pay discrimination claim.

In *Ledbetter*, the Supreme Court reaffirmed that the time for filing a charge with the EEOC begins when the discriminatory act occurs. *Id.* at 1265. In a pay discrimination case, "pay-setting" is the "discrete act" that triggers the limitations period. *Ibid.* A "new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory

acts that entail adverse effects resulting from the past discrimination." *Id.* at 2169. In other words, "[a] discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (quoted in *Ledbetter*, 127 S. Ct. at 2168).

In this case, Mynatt filed his EEOC complaint on October 25, 1999. Therefore, he is time-barred from complaining of any discriminatory acts occurring more than 300 days before that date. The 300-day limit applies because it appears that Mynatt first filed a complaint with the Tennessee Human Rights Commission (THRC), although the exact filing date is not indicated. *See* 42 U.S.C. § 2000e-5(e)(1). Assuming Mynatt benefits from the longer 300-day time limit, he is time-barred from asserting any pay discrimination claim based on discriminatory conduct which occurred prior to late December 1998.

Therefore, we may consider only those pay decisions made after December 1998. In his briefs, Mynatt asserts only that racial animus infected his entire compensation history with LMES. Mynatt presents no evidence of any race-based pay discrimination occurring during any part of his tenure at LMES, let alone post-December 1998. Corey's superior performance and length of time in his position are legitimate reasons for different pay. Mynatt has not shown any evidence that these reasons were mere pretext. Mynatt's bare assertion that "unequal pay is unequal pay," Appellant's Br. at 44, ignores the explicit direction of Title VII that unequal pay premised on non-racial factors is acceptable. Therefore, although our analysis differs from that of the district court, we affirm summary judgment for LMES on the pay discrimination claim.

## IV.  Conclusion

Therefore, for the reasons set out above, we AFFIRM the district court's grant of summary judgment.