NOT FOR FULL-TEXT PUBLICATION
File Name:  06a0492n.06
Filed:  July 13, 2006

NO. 05-3365

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

MICHAEL T. WELSH,

          **Plaintiff-Appellee,**            **ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO**

v.

WACHOVIA CORPORATION, et. al.,

          **Defendants-Appellants.**

_____/

BEFORE:    SUHRHEINRICH, GILMAN and ROGERS, Circuit Judges.

       **SUHRHEINRICH.**   Appellee Michael Welsh ("Welsh") sued Appellants Wachovia

Benefits Committee, Wachovia Short Term Disability Plan, Wachovia Long Term Disability Plan

(collectively "Wachovia"), and Liberty Life Assurance Co. of Boston ("Liberty") (collectively

"Defendants") for breach of contract relative to short-term disability benefits and improper denial

of long-term disability benefits pursuant to an ERISA [the Employee Retirement Income Security

Act of 1974, 29 U.S.C. §§ 1001-1461] employee benefit plan maintained by Wachovia, Welsh's

employer.  After a bench trial, the district court granted judgment in favor of Welsh on his claims

for breach of contract for short-term disability benefits and improper denial of long-term disability

benefits.  Wachovia and Liberty appeal.

**I. Background**

       Welsh is an employee of Wachovia.  Welsh was injured in a motor vehicle accident in

December 1991.  On March 14, 2002, Welsh stopped working and filed for short-term disability

benefits due to chronic pain, and underwent related surgery. He was denied both short-term and long-term disability benefits. Welsh returned to work on a part-time basis on August 19, 2002, and a full-time basis until January 21, 2003.

On March 14, 2003, Welsh filed this lawsuit against Defendants challenging their denial of his request for short-term and long-term disability benefits. His complaint, as amended, included claims for breach of contract (Count I), breach of fiduciary duty (Count II), unjust enrichment (Count III), conversion (Count IV), promissory estoppel (Count V), improper denial of long-term disability benefits under 29 U.S.C. § 1132(a)(1)(B) (Count VI), and breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)(B) (Count VII). The district court granted Defendants' motion for summary judgment as to Counts III and IV, alleging unjust enrichment and conversion respectively, and conducted a bench trial on the remaining claims.

The bench trial began on October 27, 2004. On November 3, 2004, at the close of the bench trial, the district court granted Defendants' motion pursuant to Fed. R. Civ. P. 50 as to Counts II, III, and V, alleging breach of fiduciary duty, unjust enrichment, and promissory estoppel. On February 10, 2005, the district court issued its memorandum opinion on the remaining claims as to Counts I, VI, and VII, alleging breach of contract, improper of long-term disability benefits, and breach of fiduciary duty.

### A. Short-Term and Long-Term Disability Plan

Liberty is the Claims Administrator for both short-term and long-term disability claims brought pursuant to Wachovia's Short-Term and Long-Term Disability Plans ("STD Plan" and

"LTD Plan"). The STD Plan is a contract between Welsh and Wachovia.[1] To qualify for short-term disability, the STD Plan states that the employee "must be unable to perform all of the material and substantial duties of [his] own occupation on an active employment basis because of an injury or sickness." The plan document describes the application process for short-term disability claims. First, the claimant must call Liberty to report the claim and "to provide the information Liberty will need in order to review and process the claim." The claimant is then assigned a Case Manager, "who will handle [his] claim throughout the approved STD period . . . and be [his] point of contact should [he] have any questions or concerns regarding [his] claim." At this point, Liberty contacts the claimant's "attending physician to obtain specific medical information about [his] condition and prognosis.Once Liberty receives all the required information, Liberty makes a decision on the claim, and notifies both the claimant and his manager of the decision. If approved, Liberty will provide an anticipated "return to work" date, if feasible

The claimant is also required to contact his supervisor or manager and let him or her know how long the absence will last. The supervisor or manager is responsible for completing the "Manager's STD Reporting Form," which is to be faxed to Liberty.

The STD Plan states that "Proof of Claim" must be given to the Claims Administrator. "Proof" is defined as

> (a) the evidence in support of a claim for benefits in a form satisfactory to the Claims Administrator, (b) an attending physician's statement in a form satisfactory to the Claims Administrator, completed and verified by your attending physician, and (c) provision by the attending physician of standard diagnosis, chart notes, lab findings, test results, x-rays, and/or other forms of objective medical evidence that may be required by the Claims Administrator in support of a claim for benefits.

---

[1] The parties stipulated that the STD Plan fell within the "payroll practice" exception of 29 C.F.R. § 2510.3-1(b)(2), and was therefore not governed by ERISA.

Notwithstanding the foregoing, the Claims Administrator may also consider other evidence of a claimed disability, including, but not limited to, evidence discovered or otherwise developed by the Claims Administrator.

The maximum period of eligibility for short-term disability benefits is twenty-six weeks. If an employee exhausts the full twenty-six weeks of short-term disability benefits, such employee may be eligible to receive long-term disability payments until age sixty-five. An employee is "totally disabled" under the LTD Plan if "because of injury or sickness, [he] is unable to perform all of the material and substantial duties pertaining to the occupation [he] held at time the disability began." An approved STD benefit does not automatically qualify an employee for LTD benefits, and Liberty must approve the claim before the employee is entitled to benefits. To qualify for LTD benefits, an employee must submit to Liberty the same type of proof that is required under the STD Plan. .

## B. Facts

On March 14, 2002, Welsh took himself out of work, without a specific note from any doctor. On March 22, 2002, Welsh called Liberty to apply for short-term disability benefits. He spoke with Linette Conger. Conger testified that she received the call on March 22, 2002, was assigned the case, and received the file on March 29, 2002.

Notes contained in Liberty's Claim File for Welsh state that on March 22, 2002, Welsh gave Conger the following names of doctors: "Dr. Hoffman, Dr. Kettler, Dr. Schneer to [sic] Cleveland Clinic, Dr. Bohman [sic], Stillery."[2]

_____

[2]The parties stipulated to the admission of all trial exhibits, including Welsh's claim file, and his expert report. The district court approved the stipulation.

Conger sent Welsh a letter setting forth the "Liberty Mutual Disability Claim Reporting and Verification Process." It stated that Liberty would be contacting the attending physicians to obtain specific medical information and prognosis. The letter also stated that it was the claimant's duty to make sure that the physicians provided Liberty with proof of disability in the form of objective medical information.

The Claim File also reflects that on March 25, 2002, Conger contacted Amy Newman, an assistant to JoAnn Walker, the Human Resources Head of Short Term Disability, to request the manager's form. On March 26, 2002, Conger verified that Welsh's last day of working was March 14, 2002, and that his date of disability was March 13, 2002.

On March 29, 2002, Conger faxed an attending physician's statement to Dr. Krebs. The claim notes state that on April 3, 2002, Conger contacted Welsh and told him that Dr. Krebs would not release any medical information because Welsh never sent him a signed authorization form. Conger informed Welsh that Liberty needed the completed forms by April 4, 2002, at 3:00 p.m. or Liberty would close the claim. Welsh told Conger that he had given the authority. Welsh also stated he was scheduled for surgery the next day with Dr. Henry Bohlman at the Cleveland Clinic.

On April 4, 2002, Welsh underwent surgery with Dr. Bohlman, for "an exploration of the right sciatic nerve which revealed an arterial venous malformation parallel medical and slightly dorsal to the sciatic nerve pulsating against the nerve." As Conger explained in her claim notes from June 12, 2002, "[t]his was ligated and resected. In addition very thick fibrous bands with intermingled vascular tissue severely compressing the sciatic nerve just under the piriformis muscle. The muscle and the fibrous band of tissue were excised."

On April 5, 2002, Conger closed the file. As of that date, Liberty claimed that the only information it had received was a Healthcare Provider Certification ("HPC") form from Dr. Hoffman. The HPC stated that Welsh was "indefinitely disabled." The HPC is used to document absences under the Family Medical Leave Act. It does not include medical records, tests, or office visit notes. However, it included Dr. Hoffman's conclusion that Welsh's "serious health condition" involved a "period of incapacity requiring absence from work," and a "chronic condition requiring periodic visits for treatment." In handwritten notes, Dr. Hoffman stated that the disability began on March 15, 2002, as the "result of multiple fractures from auto accident in 1991," and noted "medical treatment and physical therapy for severe pain."

On April 8, 2002, Liberty received an attending physician's statement from Dr. Krebs. Dr. Krebs described Welsh's physical impairment as "Class 4 Moderate limitation of functional capacity; capable of clerical/administrative activity." Krebs classified Welsh's return to work date as "unknown."

On June 5, 2002, or thereabouts, Conger told Mackey that it needed all of Welsh's information by June 7, 2002, but would give him until June 14, 2002, to provide the requisite medical records.

On June 10, 2002, Liberty received information from Dr. Krebs describing his examination of Welsh on May 23, 2002, following the surgery. Dr. Krebs noted that Welsh had again seen multiple physicians since his last appointment on April 11, 2002, including Dr. Pioro in neurology, who performed EMGs that showed evidence of some abnormal potentials; Dr. Rick Parker for a knee evaluation; a follow-up with Dr. Bohlman; and Dr. Gary Hoffman, who had performed some injections into the right hamstring muscles. Dr. Krebs noted that Welsh believed his right proximal

hamstring and piriformis syndrome-type pain had improved, but that his complaints had shifted to the hamstrings on the right distally on the knee. Welsh also complained of continued sensations of knotting and tightness and of persistent pain in the left groin region, where there was a previous swollen lymph node and an area where bone spurs were seen on a CT scan.

Also on June 10, 2002, Liberty received the clinic notes from Dr. Richard Parker, based on an office visit on June 4, 2002. Dr. Parker reported as follows:

> Seen today for left shoulder and neck problem. Also seen last week for his right knee. This note will suffice for both, since I finally have received his medical records and his x-rays. I reviewed his medical records and his history is eloquently described in Dr. Michael Joyce's note previously, so therefore, in order to summarize, he has had multiple surgical procedures relating to a motor vehicle accident where he struck a tree, resulting in severe lower and upper extremity injuries. His right knee has begun to evolve once his piriformis syndrome was treated by Dr. Henry Bowman [sic] with a piriformis release, to the point where now he can finally comfortably sit, which was not possible before. What he has done, is he has slowly evolved to where he is having more pain, radiating down into his leg and down into his knee with a clicking sensation. He has been treated by Dr. Gary Hoffman with multiple injections in his posterior hamstrings which he feels is giving him some relief. He is here for evaluation of this and says that his chief complaint is that he has a snapping in the back of his knee and then after a few hours, pain going up and down his leg. He also complains of left shoulder pain that has been going on for more than a week. He does have a history of a neck issue, treated by Dr. Gordon Bell in the past, but has held its own until a week ago when he awoke in the middle of the night with severe numbness and some pain down his left arm. He went to Hillcrest, work up for cardiac etiology was negative and he was recommended to evaluate by cardiology, but he waited to see me. He is referred today from Dr. Sal Esposito, who called me yesterday, asking that I see him. He has no primary care doctor. Nonetheless, he is complaining of some left shoulder now discomfort and weakness. He cannot lift his arm above 60 degrees.

In her claim notes from June 12, 2002, Conger reviewed the medical records from Dr. Bohlman's surgery as well as his OV note from May 22, 2002, which indicated that Welsh "is doing reasonably well–the Clmt stated he can sit for the first time in years and it doesn't bother him. In fact he can squat down and that doesn't bother him either–Clmt still has some residual achiness in

-7-

the posterior thigh–neurologically he is normal–F/U in 6 mths."   Conger therefore approved Welsh's claim from March 14, 2002 through May 22, 2002, and denied it as of May 23, 2002. Conger called Newman that day to inquire if Welsh had returned to work.  She advised Newman that the record supported disability from March 14, 2002 to May 22, 2002, but not beyond that.

On June 14, 2002, Liberty sent James Mackey, Welsh's attorney, a letter formally reporting its decision on Welsh's claim.  In the letter, Liberty acknowledged that "Mr. Welsh's job duties include continuously sitting, walking, bending, stooping, reaching above shoulder level, talking, standing, 5 days, 40 hours per week."  Liberty went on to explain that although Dr. Krebs stated Welsh's return to work date was "unknown," he never advised Welsh to stop working and offered no diagnosis.  Liberty's letter reviewed the available objective medical information and determined that the evidence did not "support a condition of such severity as to preclude Mr. Welsh from performing his occupation as Branch Manager as of May 23, 2002."

On June 14, 2002, Dr. Bohlman prepared an attending physician's statement.  He diagnosed "piriformis syndrome" and stated Welsh's prognosis from the April 4, 2002 surgery was "good."  Dr. Bohlman noted the date of Welsh's last visit as May 22, 2002, and estimated his return to work date at May 31, 2002.  He also noted that "[the patient] will be out of work approx 6-8 weeks."  He set Welsh's physical impairment at "Class 5–Severe limitation of functional capacity; incapable of minimum activity."  Also on June 14, 2002, Liberty received an attending physician's statement from Dr. Hoffman, Welsh's rheumatologist.  The report, dated May 31, 2002, indicated the date of Welsh's last visit was May 24, 2002, with a primary diagnosis of "pain."  Dr. Hoffman also stated that Welsh was "indefinitely disabled."  Hoffman listed Welsh's physical impairment as "[s]evere limitation of functional capacity; incapable of minimum activity."

On July 9, 2002, a new claims manager, Janice Borner, was assigned to handle the appeal. At trial, Borner testified that she merely processed certain appeal documents because Conger had already made the decision denying Welsh's disability benefits.

The Wachovia Appeal Benefits Committee affirmed Liberty's decision that Welsh was entitled to short-term disability benefits through May 22, 2002. After that, Wachovia placed Welsh on unpaid medical leave from July 9, 2002 until August 19, 2002 because he was unable to work. On August 8, 2002, Welsh appealed the denial of benefits beyond May 29, 2002. Welsh returned to work on a part-time basis on August 19, 2002, out of financial necessity.

On August 22, 2002, Mackey sent more information. This included a letter from Dr. Hoffman dated August 19, 2002, stating Welsh "is able to return to work intermittently, or work on less than a full schedule as a result of his current condition . . . "not to exceed 20 hours per week." Also, Peter Quinn, Jr., President of the Private Client Group for Wachovia, dated August 7, 2002, sent a letter to Welsh. Quinn remarked that because Liberty had denied his short-term disability claim beyond May 22, 2002, Walker in Human Resources had updated Welsh's status to reflect an "unpaid medical leave." Welsh also sent medical records from the Mayo Clinic, where Welsh was seen on July 25-26, 2002. Dr. Margaret A. Moutvic, M.D., diagnosed "right hamstring pain," "trauma with orthopedic injuries over left lower extremity; fused left ankle; left total hip arthroplasty; residual leg length discrepancy and pelvic obliquity as a result," and "chronic pain." Dr. Christopher J. Boes, M.D., also of Mayo Clinic, diagnosed "Left C5,6 cervical radiculopathy," "right lower extremity pain," and "left groin pain." Dr. W.R. Marsh stated that "at Dr. Boes' request, he was examining Welsh for neck and left arm pain as well as hamstring pain. Dr. Marsh

stated that the cause of the right hamstring pain was "obscure to me," and saw no surgical solution for the pain. He felt repeat injections into the hamstring insertion would be reasonable.

On August 26, 2002, Liberty sent Welsh's file to Dr. Gale Brown, a consulting physician, for review. In a memorandum dated September 30, 2002, Dr. Brown concluded that "the objective medical evidence did not support Mr. Welsh's alleged total disability," and that Welsh had the "objective capacity to perform the essential duties of his own sedentary occupation on a full-time basis, except for an eight-week period beginning 4/4/02 following his surgery." Dr. Brown stated that she discussed Welsh's condition with Dr. Bohlman's office, which confirmed Dr. Bohlman's earlier prognosis. She stated that she also attempted, unsuccessfully, to contact Dr. Hoffman on several occasions. On October 8, Liberty retroactively extended Welsh's short-term disability benefits for an additional week, through May 29, 2002.

Welsh requested a second appeal and submitted additional information. On December 19, 2002, Wachovia upheld Liberty's determination and issued a final decision on December 19, 2002, denying benefits beyond May 29, 2002.

### C. Bench Trial

Applying North Carolina law,[3] the district court ruled that Wachovia and Liberty breached their contractual obligations to Welsh, because the evidence presented demonstrated that Welsh suffered from a disabling mental condition, which was acknowledged by Wachovia employees, including Welsh's manager, and that the decision to deny Welsh the full 26 weeks of short-term disability benefits was made based upon incomplete information regarding that disability.

---

[3]The parties stipulated that North Carolina law would apply to Welsh's breach of contract claim relative to the short-term disability benefits.

The district court also held that Defendants acted arbitrarily and capriciously under ERISA because their arbitrary denial of Welsh's short-term disability benefits claim made it impossible for him to apply for and obtain long-term disability benefits. The court rejected Defendants' argument that Welsh's claim was barred by his failure to exhaust administrative remedies, since exhaustion would have been futile. The court noted that, although disabled, Welsh was ineligible to apply for long-term disability benefits because he had been denied short-term disability benefits.[4]

The district court awarded Welsh treble damages pursuant to North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1,-16 (the "Act"), based on Welsh's short term disability benefits claim. Because it found that Defendants had violated the Act and awarded treble damages, the court exercised its discretion under the Act to award attorney fees. *See* § 75-16, to -16.1.

The court also awarded attorney fees under ERISA. The court found culpability, because Defendants ignored overwhelming evidence of Welsh's disability.

Thus, the court ruled that the total amount of disability benefits due Welsh for the period of March 14, 2002, to January 20, 2003 was $177,742.00. The court ruled that the total amount of short-term disability benefits owed Welsh was $93,754.00, and trebled it to $281,262.00. The court also found that Welsh was owed $83,988.00 in long-term disability benefits. Finally, the court held that Welsh was entitled to $230,123.00, representing the taxes and lost earnings on investment

---

[4]The district court rejected Welsh's claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)(B), on the grounds that the Supreme Court has "explicitly limited a plan participant's claim for breach of fiduciary duty under § 1132(a)(3)(B) to claimants who cannot seek a remedy under other sections of § 1132." (citing *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996)).

directing resulting from Welsh's 401(k) withdrawals to compensate for the nonpayment of disability benefits. Thus, the total damages amount was $595,373.00.

The district court also awarded attorney fees in the amount of $233,261.00 and costs in the amount of $53,074.45. The court further awarded prejudgment interest set at 8% pursuant to N.C. Gen. Stat. § 24-1, on the $177,742.00 unpaid and due short- and long-term disability benefits. Finally, the court allowed for the award of post-judgment interest.

### III. Standards of Review

North Carolina law governs the contract claim, but federal law governs the standard of review. *See Paramount Fin. Group., Inc. v. Lipps*, No. 99-5751, 2001 WL 331954, *2 (6th Cir. March. 24, 2000) (unpublished per curiam); *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165-66 (6th Cir. 1993) (holding that federal summary judgment standard governed in federal diversity case).

Questions of law and mixed questions of law and fact are subject to de novo review. *Hamilton v. Carell*, 243 F.3d 992, 997 (6th Cir. 2001). Factual determinations made by the district court are reviewed for clear error. *Id.*

### IV. Analysis

### A. Duty to Assist

Defendants argue that the district court misread the STD Plan as requiring Wachovia and its third-party administrator Liberty to provide affirmative assistance to Welsh in proving his claim, and that this erroneous assumption lead the court to find that Wachovia breached the contract and to award Welsh $93,754.00 in short-term disability benefits. Instead, Defendants claim the plain language of the STD Plan (a contract) imposed a duty on Welsh to provide objective medical

evidence–in the form of test results and other diagnostic reports "satisfactory to the Claims Administrator"–to support his claim for disability, and in turn, required the claims administrator to review the evidence, and "in its *discretion*, determine whether to approve or deny his claim for benefits." (Appellants' Br. at 25.)

Under North Carolina law, contracts are construed and enforced according to their terms. *Gould Morris Elec. Co. v. Atl. Fire Ins. Co.*, 50 S.E.2d 295, 297 (N.C. 1948). "If plain and unambiguous, the meaning thus expressed must be ascribed to them." *Id.* "The heart of a contract is the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Id.* Where the language is clear and unambiguous, the court is required "to interpret the contract as written, . . . and cannot, under the guise of construction, reject what the parties inserted or insert what parties elected to omit." *Corbin v. Langdon*, 208 S.E.2d 251, 254 (N.C. Ct. App. 1974) (internal quotation marks and citation omitted). It is also the general rule in North Carolina that "[w]here a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair play." *Mezzanotte v. Freeland*, 200 S.E.2d 410, 414 (N.C. Ct. App. 1973); *accord Midulla v. Howard A. Cain Co.*, 515 S.E.2d 244, 246 (N.C. Ct. App. 1999). Finally, damages for breach of contract is the amount necessary to put the injured party in the same monetary position that it would have been in had the breach not occurred. *Canady v. Crestar Mortgage Corp.*, 109 F.3d 969, 972 (4th Cir. 1997) (citing, *inter alia*, *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 234 S.E.2d 605, 607 (N.C. 1977)).

Under the plain terms of the contract, Welsh was required to submit (1) "evidence in support of a claim for benefits in a form or format satisfactory to the Claims Administrator," (2) "an

-13-

attending physician's statement in a form or format satisfactory to the Claims Administrator," and (3) "standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence that may be required by the Claims Administrator." In turn, because the contract confers discretion on Defendants, under North Carolina law they were required to exercise their authority in a reasonable manner, based on good faith and fair play.

Furthermore, as the district court found, Section 4.9 of the STD Plan also contains a "prudent man standard" for judging the conduct of Wachovia and its agent Liberty under the Plan, namely making Wachovia liable "due to gross negligence or willful misconduct, or due to the failure to exercise fiduciary responsibility with the care, skill, prudence, and diligence under the circumstances then prevailing that a **prudent man** acting in like capacity and familiar with such matters would use." On top of that, the Summary Plan Description provides that Liberty, for its part, would also be contacting a claimant's physicians and that the claimant was to provide his physician with authorization to release medical information to Liberty. Thus, by its terms, the STD Plan placed an obligation to retrieve relevant medical information on *both* parties.

Defendants focus on certain comments made by the district court during trial and its opinion in an attempt to characterize its ruling as creating an extra-contractual "duty to assist."[1] Defendants' contention is without merit. The district court found and the record reflects numerous instances where Defendants failed to consider all of the available medical information in making its decision

___

[1]Defendants base this assertion on the district court's statement in it February 9, 2005 opinion that "[*a*]*t a minimum*, Wachovia had a *responsibility to assist* Plaintiff during the claims process. It did not do so. Liberty, as the Claims Administrator, had a *responsibility to investigate* the claims made by Plaintiff and fell woefully short." Defendants find additional support in the court's questioning of Walker, a member of the human resources department of Wachovia Securities, at trial.

to deny benefits. That finding is not related to any extra-contractual duty, but an abrogation of its contractual duty to act in good faith and as a reasonably prudent person would under the circumstances. Thus, as the district court held, under either standard, Defendants breached their contractual obligations to Welsh.

The record reflects, that, as the district court found, Plaintiff made extensive efforts to assist in compiling the necessary information, including contacting his physicians, faxing forms, requesting records, following up with Liberty, and repeatedly asking Liberty what additional information it required. As the district court found, Welsh supplied Liberty with the identity of many of his physicians. The record clearly demonstrates that Welsh's assistant, Chris Romano, and Mackey consistently followed up on Conger's requests for information and materials. Conger's own claim notes indicated that she had told Welsh that upon being provided with physicians' names, she would contact them directly, and that she did so on some occasions. The record further reflects that often the process of obtaining that information was thwarted not by Welsh, but by the doctors' offices themselves. Ironically, Conger reported many of the same difficulties in her claim notes. Although Conger must have recognized why Liberty was not receiving the information, *because the health care providers were not providing it despite repeated requests and authorizations*, Conger simply ascribed the failure to Welsh's claim.

The record reflects that, despite numerous reports from Welsh's numerous physicians, Liberty based its final conclusion on one of its regularly retained physicians to review the file, Dr. Brown. Dr. Brown rested her decision as to the duration of Welsh's disability on Dr. Bohlman's May 22, 2002 report that post-operative recovery time for Bohlman's surgery was six to eight weeks. She ignored the attending physicians' statements from Drs. Hoffman and Krebs that Welsh

was indefinitely disabled. She ignored reports from several Mayo Clinic physicians who reported that Welsh was still suffering chronic pain after Dr. Bohlman's surgery. And she ignored repeated diagnoses of chronic pain in the face of a well-documented history that Welsh's medical troubles began after suffering injuries in a motor vehicle accident. She ignored Dr. Krebs's report, made one day after Dr. Bohlman's report, that Welsh still had multiple pain issues. She ignored Dr. Parker's report from June 4, 2002, that Welsh was suffering from shoulder and neck pain. She ignored Dr. Hoffman's letter dated August 19, 2002, stating that Welsh was only able to work intermittently, and not more than twenty hours per week. She ignored the medical records from the Mayo Clinic, after his visit in late July 2002, that Welsh was continuing to suffer chronic pain.

Furthermore, Wachovia, recognizing Plaintiff's disability, required him to take unpaid medical leave, while denying his disability claim during the same period of time. Welsh's supervisor, Scott Winter, wrote the following e-mail to Peter Quinn, President of Wachovia Securities:

> Pete, I know you are aware that Mike Welsh's disability claim was denied. . . . How can you defend this decision in the face of overwhelming medical evidence as well as our own insistence that Mike cannot return to work on a full time basis unless and until his doctors provide a written release? Is this not the ultimate contradiction?

In making its final decision to uphold the denial of benefits, as the district court found, Wachovia ignored its own conclusions that Welsh was unable to work because of his condition, and never communicated this information to Liberty.

As the district court observed, "[a]lthough Plaintiff had not determined a name or classification for his disabling condition, Plaintiff was indeed disabled and unable to work." In light of the overwhelming evidence of chronic pain, Liberty's decision to basically rest its determination upon the opinion of a non-examining physician, who in turn based her decision solely on the post-

operative visit of Dr. Bohlman, and its failure to secure an independent examination, was unreasonable. *Cf. Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 512 (6th Cir. 2005) (holding that "the repeated references to [the plaintiff's] depression in the office notes of the three physicians treating [the plaintiff] for his heart condition were sufficient to require Liberty to investigate further before denying [the plaintiff] disability benefits"). The district court's ruling is supported by the record.[2]

## B. Treble Damages Award

Defendants contend that the district court erred in awarding treble damages under the North Carolina Deceptive Trade Practices Act. We agree that the Act does not apply.[3]

In interpreting questions of state law, this Court "must apply state law in accordance with the controlling decisions of the highest court of the state." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). If the state law issue has not been decided by the state's highest court, we must predict how the state's highest court would resolve it. *Id.* As guidance we look to the decisions of the intermediate appellate state courts, unless we are persuaded that the highest court would rule differently. *Pack v. Damon Corp.*, 434 F.3d 810, 818 (6th Cir. 2006). We may also consider applicable dicta of the state's highest court. *Id.*

---

[2]Defendants contend that in interpreting Wachovia's obligations under a non-ERISA contract, the district court erroneously relied upon ERISA cases, and misconstrued them. Given our conclusion that Defendants violated the STD contract under applicable state law principles, we need not address this argument.

[3]As in initial matter, Defendants assert in a footnote that the court erred in considering the claim because it was not properly pled or timely raised. The district court rejected the argument. Because we conclude that the Act does not apply, we will not address Defendants' waiver claim.

The Act makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." To establish a violation of the Act, a plaintiff must prove (1) an unfair or deceptive practice, (2) in or affecting commerce, (3) which proximately caused his injury. *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000); *Country Club of Johnston County, Inc. v. U.S. Fid. & Guar. Co.*, 563 S.E.2d 269, 278 (N.C. Ct. App. 2002). If N.C. Gen. Stat. § 75-1.1 is violated, the Act provides for treble damages. *Gray*, 529 S.E.2d at 684. The phrase "treble the amount fixed by the verdict" in the Act means that damages proximately caused by a violation of the statute shall be trebled; it does not mean that damages on every claim that happens to arise in the case must be trebled." *Id.* at 684-85.

The fundamental purpose of the Act is "to protect the consuming public." *Prince v. Wright*, 541 S.E.2d 191, 197 (N.C. Ct. App. 2000) (internal quotation marks and citations omitted); *see also Gray*, 529 S.E.2d at 681 (stating that "[i]n enacting N.C.G.S. §§ 75-1.1 and 75-16, the legislature intended to effect a private cause of action for consumers"). Thus, unfair and deceptive trade practices tend to involve buyer and seller relationships. *Prince,* 541 S.E.2d at 196. Notwithstanding this tendency, North Carolina courts have also recognized actions based on other types of commercial relationships, *id.* (and citations therein), including "'when an insurer provides insurance to a consumer purchasing a policy.'" *Id.* at 197 (quoting *Murray v. Nationwide Mut. Ins. Co.*, 472 S.E.2d 358, 363 (N.C. Ct. App. 1996)). The Act does not normally apply to typical employment disputes; at the same time "the mere existence of an employer-employee relationship does not in and of itself serve to exclude a party from pursuing an unfair trade or practice claim." *Dalton v. Camp*, 548 S.E.2d 704, 710 (N.C. 2001).

The STD benefit in this case is conferred on the employee as part of his compensation package, and thus involves a typical employment dispute. The North Carolina Court of Appeals has held that "[u]nlike buyer-seller relationships, . . . employer-employee relationships do not fall within the intended scope of G.S. 75-1.1, in spite of [a] plaintiff's strained characterization of the latter as 'sale of employment skills.' Employment practices fall within the purview of other statutes adopted for that express purpose." *Buie v. Daniel Int'l Corp.*, 289 S.E.2d 118, 119-20 (N.C. Ct. App. 1982) (holding that the Unfair or Deceptive Trade Practices Act does not create an action against an employer for harassment and dismissal of an employee following a work-related injury to prevent employee from claiming workers' compensation benefits). Subsequent appellate court decisions have adhered to the holding in *Buie*, noting "[i]t is the law of this state that [a] plaintiff cannot bring [an unfair and deceptive trade practices] action against her employer. *See, e.g., Seigel v. Patel*, 513 S.E.2d 602, 605 (N.C. Ct. App. 1999). Further, the North Carolina Supreme Court cited *Buie* for the proposition that the Act "does not cover employer-employee relations[.]" *HAJMM Co. v. House of Raedford Farms, Inc.*, 403 S.E.2d 483, 492 (N.C. 1991); *cf. Sara Lee Corp. v. Carter*, 519 S.E.2d 308, 312 (N.C. 1999) (holding that the defendant-employee's self-dealing and fraudulent business activities in selling computer parts and services to his employer fell within the ambit of the statutory prohibition against deceptive acts or practices where the parties were "clearly engaged in buyer-seller relations in a business setting"; finding *Buie* inapposite, because it had "already characterized [the] defendant's conduct as buyer-seller transactions that fall squarely within the Act's intended reach"); *United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 389 (N.C. 1988) (holding that N.C. Gen. Stat. § 75-1.1 applies where restrictive covenants are made between employer and employee). Thus,

the district court erred in applying the Act to the facts of this case.  The award of treble damages must be reversed.[4]

## C. Long-Term Disability

The district court held that Welsh was entitled to $83,988.00 for long-term benefits for the period from September 12, 2002, through January 20, 2003. Defendants argue that the district court erred in awarding Welsh damages for breach of the LTD Plan because Welsh failed to apply for long-term disability benefits and failed to create an administrative record.  Defendants state that there is no administrative record because Welsh did not provide Wachovia with any evidence regarding his medical condition from September 12, 2002 to January 20, 2003.  They note that the latest medical records Welsh provided were office notes from the Mayo Clinic dated June 18, July 25, and July 26, 2002, nearly two months prior to the commencement of the long-term disability period.  Defendants therefore claim that the district court lacked jurisdiction to award long-term disability benefits.

Welsh responds that because Defendants wrongfully denied him his full amount of short-term disability benefits, he could not by the terms of the Plan apply for long-term disability benefits, and therefore had no opportunity to build an administrative record for long-term disability benefits. Under the LTD Plan, a participant must exhaust the full twenty-six weeks of STD benefits before being eligible for long-term disability benefits. Welsh also points out that Joanne Walker, Wachovia's disability specialist, testified that a claimant does not apply for long-term disability

---

[4]Punitive damages are also not available for this type of claim.  Under North Carolina law, punitive damages are recoverable only if the breach of contract "also constitutes or is accompanied by an identifiable tortious act."  *Stanback v. Stanback*, 254 S.E.2d 611, 621 (N.C. 1979) (citing *Newton v. Standard Fire Ins. Co.*, 229 S.E.2d 297 (N.C. 1976)).

-20-

benefits to receive them; if the claimant continues to be disabled beyond the maximum duration of STD benefits, he simply transitions from short-term to long-term benefits.

This Court has repeatedly held that exhaustion may be excused if the claimant establishes futility. *See, e.g., Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 718-19 (6th Cir. 2005); *Weiner v. Klais & Co.*, 108 F.3d 86, 90-91 (6th Cir. 1997).[5] The district court is "obliged to exercise

---

[5]Defendants claim that this case presents an issue of first impression in this Circuit; namely whether a court may award a plaintiff long-term disability benefits, pursuant to an employee benefit plan, where the claimant never made a claim for long-term disability benefits, and there is no administrative record. Defendants rely on a *Peterson v. Cont'l Cas. Co.*, 282 F.3d 112 (2d Cir. 2002). There, the plaintiff applied for short- and long-term disability benefits pursuant to an employee benefit plan with Continental. Three types of benefits were available: short-term benefits, which were available for up to thirteen weeks, occupational long-term benefits, which were payable for an initial twenty-four month period after short-term were exhausted, and permanent long-term benefits, payable after the conclusion of the occupational period. *Id.* at 114. The plan denied the plaintiff's claim for short-term disability benefits, and did not address the long-term benefits request. The plaintiff sued, alleging improper denial of both short- and long-term benefits. The district court conducted an independent review of the record, and ruled that the plaintiff had demonstrated a total disability within the meaning of the long-term disability plan, and was therefore entitled to long-term benefits. *Id.* at 116.

On appeal Continental challenged the district court's ruling regarding permanent benefits. *Id.* at 116-17. The appellate court noted that Continental made its decision to deny occupational benefits several months before the plaintiff's occupation period ended, and under the terms of the policy, the decision regarding permanent benefits was to be made after the occupation period had closed. *Id.* at 117-18. Furthermore, the district court rendered its decision on the permanent disability benefits while the occupation period was still pending; thus "the issue was not even ripe for adjudication by the plan administrator, much less by the District Court." *Id.* at 118. The Second Circuit held that "absent a determination by the plan administrator, federal courts are without jurisdiction to adjudicate whether an employee is eligible for benefits under an ERISA plan." *Id.* at 117. The court vacated the judgment of the district court with instructions that the plaintiff was free to file a claim for permanent benefits and thereafter seek federal review should he be denied benefits after exhausting his administrative remedies. *Id.* at 118.

Defendants argue that we should follow *Peterson's* lead and hold that the district court lacked jurisdiction to rule on the claim for long-term disability benefits. *Peterson* is distinguishable. In that case, the court's "jurisdictional" ruling was limited by the fact that the permanent benefits question was not ripe when the district court rendered its decision. *Id.* Here, Defendants rendered the final decision on December 19, 2002, after Welsh's period of short-term disability had ended, and during the period when the question of availability of long-term disability benefits would have been ripe. Further, unlike the Second Circuit, the Sixth Circuit does not characterize the exhaustion

its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998). In assessing futility, the court must decide "whether a clear and positive indication of futility can be made." *Id.* To meet this standard, a plaintiff must show that "it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Id.* (internal quotation marks and citation omitted).

The futility doctrine is more easily applied in situations when the claimant has properly filed an application for benefits and initially been denied, but then fails to pursue an administrative appeal for whatever reason. *See Barnett v. IBM Corp.*, 885 F. Supp. 581, 588 (S.D.N.Y. 1995) ("Usually, the futility exception is applied in a context in which there has been, in some form, an unambiguous application for benefits and a formal or informal administrative decision denying benefits and it is clear that seeking further administrative review of the decision would be futile."). Here, however, Welsh was effectively precluded by the terms of the LTD Plan from applying for long-term disability benefits, and he still attempted to file for them. Thus, given our conclusion that Welsh qualified for the full twenty-six weeks of short-term disability benefits, at a minimum, his "failure" to apply for LTD benefits must be excused.

At the same time, however, Welsh acknowledges in his brief that there is no administrative record for his long-term benefits. This Court has noted that one of the purposes of the administrative

requirement as "jurisdictional" but instead holds that application of the doctrine "is committed to the sound discretion of the district court." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 418 (6th Cir. 1998); *see also id.* at 419 (stating that the administrative exhaustion requirement for claims brought under § 502 is applied as a matter of judicial discretion"); *cf. Costantino v. TRW, Inc.*, 13 F.3d 969, 974 (6th Cir. 1994) (stating that an ERISA plan beneficiary must as a general rule exhaust his administrative remedies prior to bringing a suit for recovery on an individual claim).

exhaustion requirement is "[t]o help assemble a factual record which will assist a court in reviewing the fiduciaries' actions." *Costantino v. TRW, Inc.*, 13 F.3d 969, 975 (6th Cir. 1994) (listing purposes of administrative exhaustion); *Hill,* 409 F.3d at 722 (6th Cir. 2005) (quoting *Costantino*); *see also Ravencraft v. UNUM Life Ins. Co.*, 212 F.3d 341, 343 (6th Cir. 2000) (stating that "review or exhaustion enables plan fiduciaries to efficiently manage their funds; *correct their errors*; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions" (internal quotations omitted)). Because there is no administrative record regarding long-term disability benefits, through no fault of Welsh, we think the proper recourse is to vacate the portion of the district court's order regarding long-term benefits with further instructions that Welsh be afforded the opportunity to file a claim for long-term disability benefits and pursue his administrative remedies first. *See, e.g., Brantley v. Ameritech Corp.*, No. 99-CV-76250-DT, 2000 WL 1769548 (E.D. Mich. Sept. 29, 2000) (reversing the administrator's denial of short-term disability benefits as arbitrary and capricious and remanding for a determination of the plaintiff's eligibility for long-term benefits once her short term benefits had been exhausted because the long-term benefits were dependent upon exhaustion of the short-term disability benefits).

### D. Damages Award

Defendants argue that the district court erred in awarding Welsh $230,123 in consequential damages, namely the taxes and lost earnings on investments allegedly resulting from Welsh's 401(k) withdrawals made to compensate for nonpayment of disability benefits. Defendants argue that the taxes, penalties, and lost investment do not flow from the alleged breach of contract and were not foreseeable at the time of contract.

On July 24, 2002, Welsh transferred $222,235 from his 401(k) to his IRA. On May 13, 2003, Welsh took out an additional $250,000 from his 401(k). Welsh made three withdrawals totaling $145,942.23, on February 11, 2002; May 1, 2003; and May 30, 2003. Welsh claimed that he was forced to withdraw the money from his 401(k) plan to purchase three automobiles in May 2003 that were coming off lease. He testified that he had no other assets and no further ability to borrow because of three previous loans from his 401(k) and a $475,000 loan to purchase a yacht. Welsh's expert testified that Welsh suffered immediate tax consequences and lost investment earnings from these early withdrawals.

We agree with Defendants. A party may only recover damages that were foreseeable or within the contemplation of the parties at the time the contract was made, and that flow naturally from the breach. *See Williams v. W. Union Tel. Co.*, 48 S.E. 559, 560 (N.C. 1904) (adopting rule of *Hadley v. Baxendale*, 156 Eng. Rep. 145(1854)); *see also Bloch v. Paul Revere Life Ins. Co.*, 547 S.E.2d 151, 58 (N.C. Ct. App. 2001) (noting that "[t]he interest being protected by this general rule is the non-breaching party's 'expectation interest'"; (internal quotation marks omitted)). Here, Defendants could not reasonably foresee that Welsh would suffer some sort of financial crisis in May 2003, five months after he had returned to work full-time, solely because of Defendants' failure to pay him short-term disability benefits beyond May 29, 2002. Furthermore, Welsh never connected the time or amount of his 401(k) transfers to his reduced compensation during the time he claimed short-term disability benefits. The district court erred in awarding approximately $230,000 in consequential damages.

Our reversal of the treble damages award and the ERISA judgment also requires reversal of the district court's award of attorney's fees to the plaintiff. This is an ordinary breach of contract

action and the general rule allocates to each side the responsibility to pay its own attorney's fees. *See Harborgate Prop. Owners Ass'n, Inc. v. Mountain Lake Shores Dev. Corp.*, 551 S.E.2d 207, 212 (N.C. Ct. App. 2001) (observing that the "general rule has long obtained that a successful litigant may not recover attorneys' fees, whether as costs or as an item of damages, unless such a recovery is expressly authorized by statute").

Lastly, Defendants contend the district court erred in awarding consequential damages as to the denial of Welsh's long-term disability benefits. Defendants are correct. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255-58 (1993); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 144 (1985); *Helfrich v. PNC Bank, Ky., Inc.*, 267 F.3d 477, 482 (6th Cir. 2001); *Fraser v. Lintas: Campbell-Ewald*, 56 F.3d 722, 726 (6th Cir. 1995).

## V. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED** as to Welsh's claim for short-term disability benefits; **REVERSED** as to the award of treble damages; **REVERSED** as to the award of attorney's fees; **REVERSED** as to the award of consequential damages; and **VACATED** and **REMANDED** as to the award of long-term disability benefits for further proceedings consistent with this opinion. **SO ORDERED.**